### In re MACKEY.

#### (District Court, D. Delaware. August 21, 1901.)

#### No. 31.

**1. BANKRUPTCY—PLACE OF BUSINESS.**

The defendant lived with his family on a farm in Pennsylvania, and the branches of business conducted by him were raising and selling farm products, buying and selling farm products, selling farm products on commission, and buying and forthwith slaughtering live stock and selling the meat. He had a stall in a market house in Wilmington, Delaware, where he exhibited and sold all but a comparatively small proportion of the produce handled by him. What he sold in Wilmington was not delivered pursuant to contract entered into elsewhere, but the contract of sale and the delivery of the subject of sale were contemporaneous and effected at his stall. *Held* that his principal place of business was in Wilmington.

**2. SAME—FARMER—DEFINITION.**

"A person engaged chiefly in farming", within the meaning of the bankruptcy act, is one whose chief occupation or business is farming;

and one's chief occupation or business, so far as worldly pursuits are concerned, is that which is of principal concern to him, of some permanency in its nature, which he deems of paramount importance to his welfare, and on which he chiefly relies for his livelihood or as the means of acquiring wealth, great or small.

**3. SAME—OCCUPATION.**
That one may principally devote his physical exertions or his time or his capital to a given pursuit, while a factor entitled to consideration, is not in all cases determinative of the question whether that pursuit is his chief occupation or business.

**4. SAME.**
It is impracticable, if not impossible, to define with precision the facts which will in all cases determine whether one is engaged chiefly in farming, and each case must be decided on its own circumstances.

**5. SAME—FORMER PURSUIT.**
No construction of the bankruptcy act is admissible which would permit an insolvent person, who had committed an act of bankruptcy within four months next preceding the filing of the petition, to evade the provisions of the statute, by engaging in farming after the commission of the act and before the filing of the petition.

**6. SAME—PETITION OF CREDITORS.**
Under section 59f of the bankruptcy act creditors other than original petitioners may at any time before an adjudication of bankruptcy or the dismissal of the original petition, and whether before or after the expiration of four months from the act of bankruptcy, join therein in order to supply any deficiency in the amount of provable claims originally set forth in the petition; insufficiency in amount of such claims not being an incurable jurisdictional defect.

(Syllabus by the Court.)

In Bankruptcy.

William F. Kurtz, for petitioning creditors.

J. Frank Ball, for bankrupt.

BRADFORD, District Judge. Proceedings were instituted in this case for the adjudication of William D. A. Mackey as an involuntary bankrupt. The creditors' petition was filed March 21, 1901, setting forth, among other things, that the defendant, for the greater portion of six months next preceding the filing of the petition, had his principal place of business in the Third Street Market, in the City of Wilmington and district of Delaware; that the defendant was insolvent; and that on or about January 1, 1901, he committed an act of bankruptcy in that he then made a general assignment for the benefit of his creditors. The defendant, in his answer, among other things, alleged as follows:

"And the said respondent further answering respectfully suggests and avers that 'the District Court of the United States for the District of Delaware' to which said petition was presented, has no jurisdiction to adjudge him a bankrupt, as in said petition prayed because:

"1st. The said respondent has not had his principal place of business or resided or had his domicile within the respective territorial jurisdiction of the said court for the preceding six months or the greater portion thereof from the time of the filing of the said petition in bankruptcy.

"2nd. That for the preceding six months to the filing of the said petition and for a long time prior thereto and continuously to this date, the chief place of business, residence and domicile of the respondent has been and now is in Elk Township, near Hickory Hill, in the County of Chester and State of Pennsylvania, and within the territorial limits and jurisdiction of

the District Court of the United States in and for the Eastern District of Pennsylvania.

"3rd. That for the preceding six months, or the greater portion thereof, to the filing of the said petition the said respondent did not have a place of business, within the purview of the Act of Congress relating to Bankruptcy, within the territorial limits of the said court.

"4th. That for the preceding six months, to the filing of the said petition, and for many years prior thereto and continuously to this date, the respondent has been engaged chiefly in farming or tilling the soil, being owner or occupant of a farm of one hundred and twenty acres, situate near Hickory Hill, Chester County, Pennsylvania, which he personally conducted, and in the carrying on of which and the business done thereon, the greater part of his debts were contracted, and he is therefore excepted by express terms from the operation of the said Act of Congress relating to Bankruptcy."

No application having been filed or made by the defendant within the time allowed for the filing of the answer for a trial by jury, such trial was by virtue of section 19a of the Bankruptcy Act waived, and the case has been heard on the pleadings and evidence by the court without the intervention of a jury.

Among the powers conferred on courts of bankruptcy by section 2, is the following:

"To adjudge persons bankrupt who have had their principal place of business, resided, or had their domicile within their respective territorial jurisdictions for the preceding six months, or the greater portion thereof, or who do not have their principal place of business, reside, or have their domicile within the United States, but have property within their jurisdictions, or who have been adjudged bankrupts by courts of competent jurisdiction without the United States and have property within their jurisdictions."

The defendant had not at any time after the act of bankruptcy any property in the district of Delaware; nor did he reside or have his domicile there for six months or the greater portion thereof prior to the filing of the petition. On the contrary, for many years prior to and until after the petition was filed, he continuously resided and had his domicile on his farm in Chester county, Pennsylvania. But it is contended that for the greater portion of six months next preceding the filing of the petition, he had his principal place of business in the City of Wilmington in this district. The petition, as before stated, was filed March 21, 1901. For several years prior to and inclusive of December 24, 1900, the defendant occupied a stall in the Third Street Market in Wilmington, for the exhibition and sale of meat, eggs, poultry, vegetables and other farm produce. Nearly all he sold, except grain, hay, and possibly some straw, was brought by him from his farm in his market wagon to the Third Street Market, and there disposed of. A comparatively trifling proportion of the contents of his wagon was sold and delivered at Newark and other places in this district, including several stores in Wilmington; but all the rest was taken to his market stall. He attended market once a week, leaving home early on Friday morning and reaching his stall about noon of the same day. During the afternoon of that day and the forenoon of Saturday he was employed in selling the produce he had brought from Chester county, leaving Wilmington about midday and reaching his home late in the evening of the same day. A portion of what he sold from his wagon or stall consisted of products of his farm, and the

residue, being the larger portion, was furnished to him principally in Chester county by others, to be sold on commission, or was bought by him principally there for re-sale on his own account, or consisted of calves, lambs, or other live stock bought by him from others and slaughtered and prepared on his farm. He also bought in Wilmington a portion, though small, of what he sold at his stall. What he bought from others in Chester county was paid for there and, after selling produce on commission for persons in that county, he there made settlement with them. Most of the produce furnished to him by others in that county was delivered on his farm and thence taken to his market stall. While he bought chiefly in Chester county, he sold almost exclusively in Wilmington, and principally at his stall. . There is no evidence that what he there disposed of was delivered pursuant to contract entered into elsewhere, and in the absence of such evidence, it must be assumed that, in marketing the produce, the contract of sale and the delivery of the subject of sale were contemporaneous and effected at his stall. The fact that he gathered in Pennsylvania what he disposed of in Delaware is immaterial. His business was raising and selling, buying and selling, selling on commission, and buying, slaughtering and selling. Selling was an essential part and the consummation of his business. A horse dealer or butcher may buy his stock in many states, but if horses or cattle are bought with a view to their sale at a certain place in Delaware, and that place is the principal place of sale, it is undoubtedly his principal place of business. So here, under the circumstances disclosed by the evidence, it must be held that the principal place of business of the defendant was in Wilmington, in this district, and that it was such during the greater portion of six months next preceding the filing of the petition; Friday and Saturday, September 21 and 22, 1900, being days on which the defendant was in occupation of his stall.

Section 4b excepts from its provisions a "wage-earner or a person engaged chiefly in farming or the tillage of the soil". It is admitted that the defendant was not a wage-earner or a person engaged chiefly in the tillage of the soil, in the sense in which those terms are employed in the act. But it is contended that he was "a person engaged chiefly in farming". A person engaged chiefly in farming is one whose chief occupation or business is farming. The chief occupation or business of one, so far as worldly pursuits are concerned, is that which is of principal concern to him, of some permanency in its nature, and on which he chiefly relies for his livelihood or as the means of acquiring wealth, great or small. That one may principally devote his physical exertions or his time to a given pursuit, while one of the factors entitled to consideration, is not in all cases determinative of the question whether that pursuit is his chief occupation or business. One may own, reside on and operate a farm and at the same time be engaged in the business of buying and selling stocks and other securities. The latter occupation may consume only an hour or two and the balance of the day be devoted by him to his farm, yet it does not follow that his chief occupation or business is not dealing in stocks or other secu-

rities. If such dealing is of principal concern to him and chiefly relied on by him for his subsistence and financial advancement, and if he treats it as of paramount importance to his welfare, he would not be within the category of persons chiefly engaged in farming, even were his farm to yield him some profit. Nor does the amount of capital invested necessarily determine in all cases what one's chief occupation or business is. It, like the amount of time devoted, is undoubtedly a factor to be considered, but often is not conclusive. One may erect a palatial residence in the country, and own the farm on which it stands. It becomes part of the farm, and the farm may be skillfully operated and yet not yield in profits a hundredth part of the interest on the investment. The owner may be engaged in profitable manufacturing or mercantile pursuits which enable him to pay in full the cost of his house, and thereafter maintain it from the profits on his business capital, though less than such cost. No one would in such case contend that the owner of the farm was chiefly engaged in farming because most of his capital was invested in it. It is evident that it is impracticable, if not impossible, to define with precision the facts which will in all cases determine whether one is engaged chiefly in farming, and that each case must be decided on its own circumstances. It may, however, legitimately be stated, generally, that, if it appears in a given case that one's occupation or business which is of principal concern to him, not ephemeral, but of some degree of permanency, and on which he mainly relies for his livelihood and financial welfare, be other than farming, he is not "a person engaged chiefly in farming". No one should be held exempt from the provisions of the bankrupt act on this ground unless it satisfactorily appears that he comes within the exception. The evidence on this branch of the case is voluminous and has received careful attention. The defendant, for many years and until after his act of bankruptcy, owned and operated a farm of 122 acres in Elk Township, Chester county, of which 100 acres were arable and the rest woodland. The year 1900 appears from the evidence to have been an average year with respect to the amount of crops raised on the farm. During that year the total value, according to the maximum figures as to quantity and value given by the defendant, of all crops raised there, including hay, wheat, potatoes except second size, oats, buckwheat, rye, corn and straw, was not in excess of $1,665.10, of which a large proportion, valued at $699.20 was fed or otherwise used on the farm; leaving a balance, valued at $965.90, sold by the defendant. It further appears from the evidence of the defendant, that during 1900 he raised on his farm for sale eight calves, twenty-five lambs, twenty-five pigs and from twelve to fifteen dogs, the aggregate value of which, according to his figures, did not exceed $660. He derived from his farm certain other produce so trivial in amount and value as not to require special mention. It is safe to conclude that on a liberal estimate, the total value of the farm produce for sale did not exceed $1,700, and was probably several hundred dollars below that amount. The defendant had a slaughter-house on his farm and was largely engaged in buying calves and lambs for slaughter and sale. They

were slaughtered on his farm and sold, as before stated, principally at his stall in Wilmington. With few exceptions, they were not raised or vealed on his farm, but, when bought, were forthwith slaughtered. In 1900 while he raised only eight calves he had in his market wagon each week on an average four to five calves. Indeed, with the number of cows on his farm in that year, it would not have been possible to veal more than thirty calves, had they been brought there for that purpose, of which there is no sufficient evidence. During the same year he raised only twenty-five lambs, yet his wagon each week contained on an average at least three lambs. The evidence shows that the value of the calves and lambs alone, not raised or vealed by him, but bought by him from others and slaughtered and sold from his wagon or stall, was far in excess of the total value of all crops of the farm, together with all calves, lambs and pigs raised there, and without any deduction for grain or straw fed or otherwise disposed of on the farm, and was at least twelve times the value of the lambs and calves raised or vealed on his farm, and about six times the value of all pigs, dogs, lambs and calves raised or vealed there. He also sold on commission from his wagon or stall in Wilmington a considerable quantity of farm products supplied to him by others, a portion of which consisted of chickens, butter and eggs. He took on an average each week in his wagon to market from fifteen to twenty chickens, most of which, as stated by his son, were sold on commission or had been bought by the defendant from others; and from seventy-five to one hundred pounds of butter, all of which was sold on commission or had been bought by him from others; and three crates containing ninety dozen eggs, of which not more than five dozen were produced on his farm; eighty-five dozen being either sold on commission or bought by him from others. His wagon rarely returned with produce in it. Without going into further detail, it appears from the evidence, taken as a whole, that during 1900 the value of the meat and other produce taken by the defendant to market could not have been less than $6,000, and that, on a liberal estimate, of this meat and produce, the produce from his farm, including meat, did not amount to more than $850., leaving a balance of not less than $5,150., representing the value of meat and other produce sold by him on commission or bought by him from others. This balance is approximately three times as large as the total value of all the crops on the farm sold by him, together with the total value of all meat and other produce of the farm sold from his wagon or at his stall during 1900. The evidence is also clear that it would not have been possible to raise on a farm of the size of that of the defendant more than a small proportion of what he marketed here and that the most extensive and important branch of his business consisted in buying and slaughtering live stock and preparing and selling the meat. Further, nearly, if not quite, as extensive as the farming branch of his business was his occupation of selling on commission. In so far as he bought and forthwith slaughtered live stock and prepared and sold the meat, he was a butcher, and not a person engaged in farming within the meaning of the bankruptcy

act; and, in so far as he sold on commission farm or other produce supplied to him by others, his business was other than farming. These branches of business are frequently carried on by persons living in cities and towns, and it is not unusual to find them also conducted by persons living in the country. From motives of economy or natural inclination in many cases, persons engaged in such business have their homes on farms; but this circumstance does not of itself change the nature of the business nor the character of those employed in it. With the defendant there lived on the farm as their home his wife, a daughter, a son about twenty-two years old, and a hired boy about twelve years old. The defendant, with the assistance of his son and hired boy, carried on all branches of his business. At least two and a half days in each week, Thursday afternoon, Friday and Saturday, were devoted to his business other than farming. He states in a general way that the balance of each week was given up to farming; but there is no evidence that during or before 1900 more than two and a half days were on an average actually employed each week in conducting the farming branch of his business, and in the absence of such evidence it may well be doubted whether such was the fact. Whatever were the farming exigencies during those days in each or any week, they yielded to the demands of the business to which those days had been devoted, as of paramount importance. A large proportion of the defendant's indebtedness, aside from amounts representing purchase money for his farm, was incurred in his branches of business other than farming. The evidence as a whole has satisfied me that the defendant did not chiefly rely on farming for his livelihood or for the means wherewith to pay his debts; that farming was not considered by him as of paramount importance; that it was not of principal concern to him; that it was not his chief occupation or business; and that, consequently, he was not "a person engaged chiefly in farming" in the sense of the bankruptcy act. There is no satisfactory evidence that after the act of bankruptcy and until the filing of the petition, or at any time between the occurrence of those events, the defendant was "engaged chiefly in farming". Nor should I deem it material if he had been so engaged during that period. No construction of the bankruptcy act is admissible which would permit an insolvent person, who had committed an act of bankruptcy within four months next preceding the filing of the petition, to evade the provisions of the statute by engaging in farming after the commission of the act and before the filing of the petition. In re Luckhardt (D. C.) 101 Fed. 807. As was well said in that case, "the excepted occupations are not designed as a refuge for insolvent debtors laden with property and fleeing from other callings."

At the hearing the defendant, having obtained leave of the court in that behalf, filed certain amendments to his answer, denying that he was indebted to the petitioning creditors in the amounts set forth in their petition, and alleging that his total indebtedness to them was less than the sum of $500 required by section 59b. The evidence sustained this allegation and subsequently, during the hearing and more than four months after the alleged act of bankruptcy, the coun-

sel for the petitioning creditors representing other creditors of the defendant presented their petitions, praying to join in the original petition under section 59f, in order to supply the deficiency in the amount of provable claims set forth in the original petition, and to conform to the requirements of the statute. Opposition was made on the part of the defendant to the granting of leave to the latter creditors to join in the original petition, but this court, after some hesitation and on careful consideration of the point, allowed their application. The position was taken by the defendant that the joining of such creditors in the original petition, if permitted, virtually would constitute a new petition, which must be considered filed as of the day of such joinder; that by virtue of section 3b a petition in involuntary bankruptcy must be filed within four months next after the act of bankruptcy; and that, the deed of assignment having been recorded December 28, 1900, more than four months before application was made for such joinder, it would be beyond the jurisdiction of the court to allow it. This contention cannot, in my opinion, be sustained. It is a familiar canon of construction, applicable to statutes as well as to written instruments, that in case of seeming inconsistency or repugnancy between particular provisions or clauses resort should be had to other parts or the whole of the statute or instrument for light as to the meaning and scope of such provisions or clauses, and to ascertain whether they are not fairly susceptible of such a construction as will accord effect to each of them. This court certainly had jurisdiction over the original petition; for it contained the necessary averments, including the allegation that "your petitioners are creditors of said William D. Armstrong Mackey, having provable claims amounting in the aggregate, in excess of securities held by them, to the sum of five hundred dollars ($500)." It is also alleged and proven that the defendant owes debts to an amount exceeding $1,000; that he was insolvent; that he committed an act of bankruptcy; and that the original petition, which was sufficient on its face, was filed against him within four months after that act. The court did not lose the jurisdiction which it had acquired on the filing of the petition, when it appeared that the petitioning creditors had not provable claims amounting to $500. The dismissal of the petition in such a case is necessary, unless the fault be corrected; but such fault can be cured. While the bankruptcy act requires in involuntary proceedings a petition to be filed within four months after the act of bankruptcy, it nowhere provides that the petition shall not be amended after the expiration of that period. General order 11 (32 C. C. A. xiv., 89 Fed. vii.) promulgated by the supreme court by virtue of section 30 as a proper rule or order "as to procedure and for carrying this act into force and effect", without any restriction as to time, provides that "the court may allow amendments to the petition and schedules on application of the petitioner." This power of amendment is substantial and conferred for effecting the broad purposes of the act, and is not confined to niceties of diction or other immaterial or merely formal matters. To hold that it does not embrace the insertion of material and essential averments at any stage of the proceedings before judgment, would reduce it to a shadow.

But it is not necessary to rely on general order 11; for section 59f, without restriction or qualification, provides that "creditors other than original petitioners may at any time enter their appearance and join in the petition". I find no warrant in the act, considered as a whole, for restricting this provision to cases in which the petition not only contains all the required averments, but is sustained by evidence establishing each of them; nor to cases in which "creditors other than original petitioners" seek to join in the petition within four months next after the alleged act of bankruptcy; nor to cases in which creditors sufficient in number and in the amount of their provable claims originally join in the petition. Section 59 distinctively deals with the number of creditors required to join in the petition and the amount of their provable claims. By clause "d" it is provided that where the petition avers that there are less than twelve creditors, and in fact less than three creditors have joined therein, and the answer avers the existence of a larger number of creditors, a list of all the creditors with their addresses shall be filed, and notice given to them of the pendency of the petition, "to the end that parties in interest shall have an opportunity to be heard", and "if upon such hearing it shall appear that a sufficient number have joined in such petition, or if prior to or during such hearing a sufficient number shall join therein, the case may be proceeded with, but otherwise it shall be dismissed." Here the intent is clear that "prior to or during" the hearing creditors other than the original petitioners may join in the petition. There is no qualification, express or implied, that such hearing must be had within four months next after the alleged act of bankruptcy in order that such joinder may be permitted. The original petition may be filed on the last day of the four months and the hearing not be had for months thereafter, yet the clause applies to such a case. This provision shows that insufficiency in the number of creditors was not regarded by congress as an incurable jurisdictional defect. Indeed, if it were, there would be nothing before the court in which "creditors other than original petitioners" could join. It further shows that congress intended that a joinder should be allowed prior to or during the hearing, whenever had. While clause "d" relates to cases of dispute as to the sufficiency in number of petitioning creditors where it is alleged that the creditors of the defendant are less than twelve, clause "f" is broader in its terms and application. It provides that "creditors other than original petitioners may at any time enter their appearance and join in the petition." As insufficiency in the number of the petitioning creditors is not an incurable jurisdictional defect, by parity of reasoning insufficiency in the amount of provable claims of such creditors cannot be held such a defect; for the bankrupt act equally requires sufficiency in number and sufficiency in amount in order that the petition may be sustained. Clause "f" was evidently intended to correct defects of either kind at any time during the pendency of the proceedings, whether before or after the expiration of four months from the alleged act of bankruptcy. This construction of the clause is in harmony with its language, is calculated to protect the interests of creditors, and involves no hardship to the defendant. On the other

hand, to construe the provision according to the contention of the defendant would open the door to fraud and collusion between the defendant and petitioning creditors, and largely defeat the operation of the bankruptcy act, to the prejudice of the other creditors. No construction of the clause which in practice would permit the filing of a petition by pretended creditors or by creditors falsely or mistakenly representing provable claims to the requisite amount and the postponement of the hearing until after the expiration of four months from the alleged act of bankruptcy, and then, on the discovery at the hearing of insufficiency in number or in amount, exclude other creditors from joining in the petition and validating the proceedings, can be tolerated. For in such case it would be too late to file another petition for the same act of bankruptcy and bona fide creditors would be wholly deprived of the benefits of the bankruptcy act. Further, even were the language of the clause less clear, the confusion, uncertainty and embarrassment in the settlement of a bankrupt's estate which necessarily would result from the construction contended for should cause any court to reject it. For the reasons given, the joinder, in my opinion, was properly allowed in this case. The authorities support the conclusion reached. In re Romanow (D. C.) 92 Fed. 510; In re Stein, 45 C. C. A. 29, 105 Fed. 749.

Swift and Company, a corporation of Illinois, having a provable claim, established by the evidence, against the defendant, amounting to $141.60, is one of the creditors for whom application was made to join in the original petition. Unless this claim, or a portion of it, be included in the petition, the latter will not conform to the statutory requirement as to amount. The defendant contends that the local manager of Swift and Company had no authority, express or implied, to sign and verify a petition for such joinder. The evidence fails to satisfy me that such authority existed. Leave is granted to Swift and Company, through its appropriate officer, to sign and verify a proper petition for joinder in the original petition; and, on the filing of the same on or before September 5, 1901, the defendant will be adjudged a bankrupt; otherwise the petition will be dismissed.

(September 11, 1901.)

The opinion filed in this case August 21, 1901, contains, among other things, the following:

"Swift and Company, a corporation of Illinois, having a provable claim, established by the evidence, against the defendant, amounting to $141.60, is one of the creditors for whom application was made to join in the original petition. Unless this claim, or a portion of it, be included in the petition, the latter will not conform to the statutory requirement as to amount. The defendant contends that the local manager of Swift and Company had no authority, express or implied, to sign and verify a petition for such joinder. The evidence fails to satisfy me that such authority existed. Leave is granted to Swift and Company, through its appropriate officer, to sign and verify a proper petition for joinder in the original petition; and, on the filing of the same on or before September 5, 1901, the defendant will be adjudged a bankrupt; otherwise the petition will be dismissed."

On September 4, in open court, counsel for the petitioning creditors, for the defendant and for Swift and Company all being present,

application was made by the counsel for the petitioning creditors that certain additional creditors of the defendant having provable claims be allowed to join in the original petition, and also for a re-hearing of the case on the question whether, aside from the claim of Swift and Company, the provable claims represented by the creditors who had theretofore joined in the petition, did not amount in the aggregate, in excess of the value of any securities held by them, to $500 or over. At the time of the application the counsel for the petitioning creditors stated that he had failed to receive any petition from Swift and Company for joinder, under the leave granted by the court. The counsel for Swift and Company then stated that shortly after the filing of the opinion he had forwarded to that company a petition for joinder, which had been duly signed and verified and had been returned to him from his client with instructions to file it; that it was then in his possession; that the instructions he had received to file it had not been countermanded; that he had not filed it and it was not his intention to file it, because of circumstances "which as counsel for Swift and Company seemed to me to justify my withholding the petition"; and that a proposition or rather a suggestion had been made to him that while Swift and Company "might receive a dividend in the case * * * it might be worth the while of a creditor of the bankrupt to purchase the claim of Swift and Company." It appears from the evidence theretofore adduced in the case that the local manager of Swift and Company had filed on its behalf the original petition for joinder at the instance of the same counsel who represented that company at the time of the application now under consideration, and on his assurance that the local manager was authorized to verify and file the same. It also appeared from statements in open court that the counsel for Swift and Company had at the instance of the counsel for the petitioning creditors undertaken since the filing of the opinion to forward to that company for execution a proper petition for joinder, and, as above stated, had received it properly verified and with positive instructions to file it. The course pursued by the counsel for Swift and Company had a tendency to mislead creditors who otherwise might or would have been desirous of joining in the original petition, and certainly was not calculated to induce the court to withhold or restrict, even if it had power so to do, the right of creditors other than original petitioners to join in the petition pursuant to section 59f of the bankruptcy act. Under these circumstances, and on the application of the counsel for the defendant, who admitted that the additional creditors seeking to join in the original petition had provable claims as set forth in their respective petitions, September 6 was fixed by the court for the further hearing of the case; at which time the last mentioned petitions were filed and the petitioners therein joined in the original petition by direction of the court. The petition of Swift and Company has not been filed; but, aside from it, it appears and is admitted that the provable claims of the petitioners in excess of any securities satisfies the requirement of the act as to amount. An alleged provable claim of Walter C. Montgomery against the defendant is not included in the amount of admitted provable claims of the petitioners sufficient

to sustain the petition. Nor does the court now decide that he has not a claim which may be proven in due course against the estate of the defendant in bankruptcy. In view of these facts, it is unnecessary to determine whether the amount of provable claims, exclusive of the claims of the petitioners last joining in the original petition, was sufficient to warrant an adjudication of bankruptcy. The defendant must be adjudged a bankrupt.