### BANK OF DEARBORN et al. v. MATNEY.

(District Court, W. D. Missouri, St. Joseph Division. April 16, 1904.)

1. BANKRUPTCY—WHO MAY BE MADE BANKRUPTS—PERSON CHIEFLY ENGAGED IN FARMING.

Under the rule that a person's chief business is that which is of the most concern to him and on which he chiefly depends for a livelihood or the making of money, a man whose products from the land cultivated by him amount to not more than from $1,500 to $1,800 per year, while during the same time he expends in the purchase of live stock and feed for

---

¶ 1. What persons are subject to bankruptcy laws, see note to Mattoon Nat. Bank v. First Nat. Bank, 42 C. C. A. 4.

the same something near $15,000 per year, and who has become indebted, mainly through his live stock transactions, to the amount of more than $50,000, is not "chiefly engaged in farming," within the meaning of the bankruptcy act, and is not exempt from proceedings in involuntary bankruptcy.

In Bankruptcy. Hearing on involuntary petition.

Gabbart, Nichols & Pistole and Brown & Dolman, for petitioning creditors.

Culver, Phillip & Spencer, for bankrupt.

PHILIPS, District Judge. This is a petition in involuntary bankruptcy. There is no question made, if the defendant is subject to the operation of the bankrupt act (Act July 1, 1898, c. 541, § 1, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3419]), that he had not committed acts of bankruptcy at the time of the filing of the petition against him. The question of fact and law raised by his answer is as to whether he was chiefly engaged in farming or the tillage of the soil. By stipulation of the parties the case was referred to A. L. Vories to hear the testimony and report his findings thereon, with the evidence. As he was not directed to report his conclusions on the facts and the law, he has reported merely a summary of the facts found by him. The petitioning creditors made special requests for other and different findings of fact, and took exceptions to the action of the special master, and the whole matter has been submitted to the court for consideration.

After hearing the case discussed by respective counsel and an examination of the evidence, I could not escape the impression that the findings of fact by the special master are too meager, indefinite, and wanting in fullness, to warrant the court in determining the case alone upon his findings. Without re-referring the matter to the master with directions for a fuller analysis of the evidence and more specific findings, I have examined the essential evidence for myself, and the controlling facts will appear in the following discussion:

It is not every person engaged in farming or the tillage of the soil who is exempt from the operation of the bankrupt act, but it is a person "engaged chiefly in farming or the tillage of the soil." The courts are generally agreed that the term "farming" is not synonymous with a tiller of the soil. To constitute one a farmer it is not essential that he in person should till the soil, or that his operations should be limited to agricultural planting, sowing, and cultivation of the soil. Yet the context indicates that the terms "farming" and "tilling of the soil" are more or less closely allied. The word "farming" was doubtless employed in the act as a generic term, in a comprehensive sense. The lawmakers, coming from the wide extent of the Republic, with its diversified agricultural adaptability, are to be presumed to have had in mind their knowledge of the methods in different localities of conducting the business of farming. It is therefore reasonable to conclude that the term was not limited merely to the production of grains and grasses and the like. The farmer may cultivate all or a part of his lands. He may be general or special. He may devote his cultivation to the production of corn, or wheat,

oats, or rye, or grasses, whichever, in his judgment, may be the more useful and profitable. He may include also with these breeding, feeding, and rearing of live stock, embracing cattle, horses, mules, sheep, and hogs, for domestic use and for market. If he find it more profitable to feed his agricultural products or his grasses to live stock than to rely upon marketing the surplus, he may not be limited to the quantity of live stock for such purpose to what he may breed or rear on his farm. For this purpose he may rely entirely upon the purchase of such live stock from his neighbors or on the market, and utilize his farm products in feeding and fattening such "feeders" for market. Neither, in my opinion, should the act be so construed as to restrict the farmer entirely, under all circumstances and conditions, to the corn and hay and grasses he may produce for rearing such feeders and preparing them for market. In other words, where he relies largely upon his pasture lands for grazing his cattle, and his crops of corn may not be sufficient to carry them through the particular winter and the feeding season, he may supplement these by purchasing from without sufficient corn, and the like, to meet the requirement. But certainly there should be apparent such relation between his method of farming and the buying and feeding of cattle, hogs, and the like, for market, as to reasonably indicate that his farming is not made principally subsidiary to the business of buying and selling cattle. So that, if his chief business is that of thus trading in cattle, using his lands as a mere feeding station, relying upon the purchased feed from the market for preparing them for sale much more than on his agricultural products, he may cross the dividing line between farming as his chief business and trading in cattle as his chief source of livelihood. No hard and fast rule can safely be laid down by the courts indifferently applicable to all cases. Each must depend more or less upon its own particular facts.

The case of In re Thompson (D. C.) 102 Fed. 287, principally relied upon by the defendant, is in accord with the views entertained by this court of the limit of indulgence to be accorded to the farmer. It is observable that the learned judge made the case turn upon the fact that, taking into consideration the quantity of land in cultivation and its product, and the quantity of stock raised and bought, there was not such disproportion between the defendant's farming and cattle trading operations as to exclude him from the protection of the bankrupt act.

In Re Mackey (D. C.) 110 Fed. 355, the court has furnished a most sensible and just rule for determining whether the person be engaged chiefly in farming or other business run in connection therewith. The court said:

"A person engaged chiefly in farming is one whose chief occupation or business is farming. The chief occupation or business of one, so far as worldly pursuits are concerned, is that which is of principal concern to him, of some permanency in its nature, and on which he chiefly relies for his livelihood, or as the means of acquiring wealth, great or small. That one may principally devote his physical exertions or his time to a given pursuit, while one of the factors entitled to consideration, is not in all cases determinative of the question whether that pursuit is his chief occupation or business. * * * If such dealing is of principal concern to him, and chiefly relied on by him for his

subsistence and financial advancement, and if he treats it as of. paramoun. importance to his welfare, he would not be within the category of persons chiefly engaged in farming, even were his farm to yield him some profit. * * * It is evident that it is impracticable, if not impossible, to define with precision the facts which will in all cases determine whether one is engaged chiefly in farming, and that each case must be decided on its own circumstances. It may, however, legitimately be stated, generally, that, if it appears in a given case that one's occupation or business which is of principal concern to him, not ephemeral, but of some degree of permanency, and on which he mainly relies for his livelihood and financial welfare, be other than farming, he is not 'a person engaged chiefly in farming.' No one should be held exempt from the provisions of the bankrupt act on this ground unless it satisfactorily appears that he comes within the exception."

The same test is applied by the court in Wulbern et al. v. Drake, 120 Fed. 495, 56 C. C. A. 645, as follows:

"It does not matter if the person may have other business or other interests, if his principal occupation is that of an agriculturalist—if that is the business to which he devotes more largely his time and attention—which he relies upon as a source of income for the support of himself and family, or for the accumulation of wealth."

In the case at bar it is true that the defendant grew to manhood on his father's farm. After he attained his majority and began to work for himself, his father had a store on the homestead, and was postmaster there, and at one time ran a mill. He gave his principal attention to his store and the post office. The farm and homestead, consisting of about 385 acres, were run by the defendant and his brother, accounting to the father for one-half of the crops. The defendant from the outset manifested a passion for dealing in cattle, buying and selling, so much so that it was conceded in argument that up to 1893 he dealt in the buying and shipping of cattle to such an extent that he became largely indebted for moneys borrowed to exploit this business. Up to 1900 he and his brother continued to occupy the farm as tenants under the father; so that during that period his farming operations, as such, consisted in the use of 192½ acres of land of his father, on which he paid one-half of the crop as rental. On pages 383–4 of the evidence the defendant, in effect, states that on his father's farm of 385 acres, occupied by him and his brother, he had about 50 acres of corn land, which he cultivated every year, and from 50 to 70 acres of pasture, which he used for keeping his mules, milch cows, and horses; and that sometimes he and his brother jointly cut 25 or 30 acres of grass, which was used between them. It does not appear that he turned over any part of this to his father. There is no statement by him that they cut any hay during the two years of 1901 and 1902. He also had what is known in the evidence as the Seals place, 142 acres, which he owned. On this he raised 35 acres of corn every year, and leased for one-half the crop, to various parties, 20 acres or more, because it was "stumpy, and hard to cultivate, and it was too expensive to keep things repaired." He also had 10 acres of oats on this piece. On that part of his farm not cultivated—about 67 acres—he kept hogs and cattle, which he fed. He kept no stock cattle on it. During the year 1901 he did not rent any pasture, and used no land except his father's farm and the Seals place. The corn crop averaged, in the year 1901, from

30 to 35 bushels per acre. Giving him the full benefit of the 35 bushels, the result was as follows:

| | |
|---|---:|
| One-half corn crop on his father's place | 875 bushels |
| 35 acres on Seals place | 1,225 bushels |
| One-half of 20 acres leased | 350 bushels |
| Total | 2,450 bushels |

The price of corn was stated to be 60 cents per bushel, which would make $1,470. Add the approximate value of 10 acres of oats, $125, would make a total value of crop of $1,595. If to this is added the rental value of the 60 acres of pasture used on his father's farm at $3 per acre, $180, the approximate result of the farm product for 1901 is $1,770. In 1902–1903 he cultivated the same land as in 1901, but the corn was better, averaged 40 to 45 bushels per acre, which would make his crop amount to 3,150 bushels; and as the corn that year was 33 cents per bushel, it made the value of his corn crop $1,-039.50. He rented 50 or 60 acres of pasture from one Osborn. Conceding 60 acres, at $3 per acre, this would amount to $180. He raised 15 acres of rye, instead of 10 acres of oats, as the year before, which was about the same value of the oats—making the total result of his farming and pasturage that year at not exceeding $1,600. He bought some more land in the early part of 1903, which made the amount of land he owned and the leased land, in 1903, something over 600 acres. The result of his business operations was that in August, 1903, when the petition in bankruptcy was filed against him, he was indebted to the extent of over $52,000. It is conceded that over $39,000 of this indebtedness is referable to his dealings in live stock and the purchase of corn for their feeding. The land owned by him, 295 acres, was valued at about $65 an acre, which would leave $5,000 or $6,000 representing his land after taking out the purchase money. The account of his purchases of corn during the feeding season between the fall of 1901 and the incoming crop of 1902, as shown by his checks on the Bank of Dearborn, is as follows:

| | | |
|---|---:|---:|
| Councilman & Co., Nov. and Dec., 1901 | $1,210 | 19 |
| Freight on same | 208 | 00 |
| Sales, Grable & Boydston, Nov. & Dec., 1901 | 497 | 35 |
| Frank Bruce, April 28, 1902 | 73 | 00 |
| Shipped in 5 cars, fall 1901, 3,700 bu., at 60c | 2,220 | 00 |
| Total | $4,208 | 54 |
| Bought from T. P. Gordon between March 29 and Aug. 2, 1902 | 4,282 | 61 |
| Freight on same | 415 | 69 |
| Making a grand total of | $8,906 | 84 |

—From which it would appear that, while the defendant's total crop and pasturage for 1901 amounted to about $1,770, an examination of his checks at one bank shows that he spent $8,906 that season for corn, while his mortgages indicate that he must have expended about $6,700 for stock to feed.

There is some difficulty in arriving at the exact history of the purchase of all cattle covered by his various mortgages, as is illustrated by the mortgage of October 31, 1901, which he kept from the record so long. It covered 100 head of steers one year old, mostly Here-

ford and Black. It is not disclosed when he bought this blooded stock, nor where. From his examination the following facts do affirmatively appear: That in 1900 he purchased 10 mule colts, which were at once sold, price not stated. Also between 50 and 60 calves, which were taken onto the farm. During that year he shipped one car load of cattle and hogs, mixed, three cars of hogs, three cars of cattle, and two other car loads of stock, not specially designated by the evidence. In 1901 he bought 10 mule colts at $57 per head, which he kept from a year and a half to two years, and sold for from $125 to $175 per head; 55 or 57 calves, at $14 per head, which went on the farm. He shipped during that year one car load of cattle and hogs, mixed, and one car load of cattle, hogs, and sheep, mixed. In 1902 he purchased 7 mules, 1 of which was returned, and traded for 2 others; 140 calves, at $21.25 per head, out of which he at once sold 40 heifer calves; and shipped two car loads of cattle and one car load of sheep, hogs, and cattle. He also purchased 80 head of shoats, some of his hogs having died that year of cholera. In the spring of 1903 he purchased six aged mules, two of which he sold shortly thereafter. The others were worked on the farm. He also purchased a cow and calf for family use, and four fat cows to fill out a car load of cattle; and he also shipped one car of fat hogs. The evidence shows that under ordinary husbandry the annual expense of conducting the defendant's farming operations would not exceed $1,200. The evidence shows, from his accounts with the banks, that during his operations he did business with the banks aggregating $94,622.19, made up as follows: First National, St. Joseph, $42,-195.66; Bank of Dearborn, $44,426.53; Tootle-Lemon Bank, $8,000. This extraordinary amount of business done by such a farmer with the banks excites special wonder as to how such extensive financial operations can consist with the idea that the defendant was chiefly engaged in farming on such a quantity of land. They can be traced in this evidence to no other source than his specialty in dealing in live stock.

The defendant claims in extenuation of his large indebtedness at the banks that the bulk of it was created prior to 1893, and that he has been carrying much of it since, paying interest thereon. He seems to have kept books prior to that time, but none since. He furnishes in his evidence no data from which the approximate amount of his indebtedness can be ascertained in 1893; but the evidence does show his chattel mortgages given to the banks for borrowed money, which were secured on live stock, as follows: March 4, 1901, First National Bank of Buchanan County, $4,000, covering the following personal property: 70 head of steers one year old; 100 head of hogs, average weight 200 pounds; 10 yearling mules; 6 head of aged work mules; 75 head of yews and 40 lambs—all of which he agreed to keep "on full feed of corn, hay, fodder, and grass." On November 1, 1901, note, First National Bank, for $2,700, secured by mortgage on live stock purchased. October 31, 1902, chattel mortgage on cattle to secure $2,860. July 26, 1903, another mortgage to secure $4,000. The deed of trust in evidence given by him August 29, 1903, conveying all his property in trust for the benefit

of designated creditors, covers 167.66 acres of land, with crops growing thereon; 142 acres of land, with crops growing thereon, situated in Buchanan and Platte counties, Mo., subject to deed of trust for the sum of $1,840, a deed of trust for $3,000 and a deed of trust for $8,400—making in the aggregate the sum of $13,240; also an undivided one-half interest in 40 acres of growing corn on William Matney's farm, on which the defendant then lived; also 81 head of yearling steers and 53 head of two year old steers, 81 head subject to a mortgage theretofore given to the First National Bank of Buchanan county, October 31, 1902, to secure a debt of $2,800, and 53 head of steers subject to a mortgage to the same bank to secure the sum of $4,000, dated July 23, 1903. The other personal property described in this deed consisted of a pair of four year old bay mules, a pair of brown mules four years old, 2 other mules, one gray mare, 15 sows—all of which are subject to a mortgage to the Tootle-Lemon National Bank to secure $7,800; also about 1,000 bushels of corn, 2 old cultivators, 2 breaking plows, 1 farm wagon, 1 single seated buggy, 2 sets of old double harness, 1 harrow. After allowing to him his claimed exemptions, the trustee realized on sale of the personal property not covered by mortgages the sum of $105.

The state of the proofs is such, relying as it does largely upon facts obtained from the defendant's testimony, when he kept no books since 1893, as to render it impossible to ascertain from the evidence exactly the times of his purchases and the number and cost of live stock actually purchased by him on the market. The following summary is gathered from his own statement: During the period preceding 1900 of, say five years, he purchased 6 car loads of cattle for immediate shipment, the car loads averaging from 16 to 18 head of cattle. He also during that time purchased, fed, and sold sheep to the extent of a car load a year. In 1900 he purchased 10 mules, colts, which were at once sold; price not stated. He also purchased between 50 and 60 calves, taken onto the farm. He shipped one car load of cattle and hogs, three cars of hogs, three cars of cattle, two other car loads of stock, not specially designated by the evidence. In 1901 he bought 10 mule colts, $57 each, which he kept from a year and a half to two years, and sold for from $125 to $175 per head. He bought 55 or 57 calves at $14 per head, which went onto the farm. He shipped one car load of cattle and hogs, and one car load of cattle, hogs, and sheep. In 1902 he bought 140 calves at an average price of $21.25, out of which he at once sold 40 heifer calves; and shipped two car loads of cattle and a car load of sheep, hogs, and cattle. He also purchased 80 shoats (some of his hogs died of cholera); 3 mules of Guyton & Harrington, 3 from Jack Hahn, 1 from Milt Gustin (one of which he traded to one Black for a pair, paying $155 to boot), and 2 mules bought in Kansas City, for the freight on which he drew his check on the Bank of Dearborn, and which cost $400. The probable estimate of the cost of the 10 mules would be in the neighborhood of $1,500. He also had about 100 head of Hereford and Black yearling steers, mortgaged October 31, 1902. These were probably calves in 1901, but he testifies that he only bought 55 or 57 calves that year, leaving it inferable that he

must have purchased somewhere about 40 or 43 not accounted for as yearlings in 1902; and it is inferable that they were paid for with the proceeds of the mortgage of $2,360 which covered them.

It does seem to me, in view of the conspicuous, controlling facts in this record, that the defendant's case is brought within the rule given by the court, supra, that where "one's occupation or business which is of principal concern to him, not ephemeral, but of some degree of permanency, and on which he mainly relies for his livelihood and financial welfare, be other than farming, he is not 'a person engaged chiefly in farming.'" Beyond question the defendant's energies of body and mind and his time were principally devoted to the matter of buying and marketing live stock as the chief source of his livelihood, and to which he chiefly looked for financial success. When he rented lands, it was solely to get more pasture for the stock he was buying and preparing for market. His crops cultivated bore comparatively little relation, in proportion, to the amount he bought for his feeders. The great bulk of his indebtedness was for moneys borrowed for his cattle speculation. That was his permanent, specific business. His farming was merely auxiliary—the incident, and not the principal thing. Banks and others loaning him money gave him credit on his cattle, and took mortgages thereon. His preferred creditors, whose chattel mortgages are involved in this controversy, were secured on the live stock he purchased. To hold such a debtor, with his lands all covered by mortgages, owing $40,000 growing out of buying and feeding live stock, is chiefly engaged in farming, it does seem to me would be to yield to a sentiment, rather than the spirit of the bankrupt act, which is designed to secure equality among creditors. Where such a debtor seeks protection under the exemption of the statute, he should present tangible, reliable evidence to bring himself within the exception. This the defendant failed to do to the satisfaction of the court.

It results that the petition to have the defendant adjudged a bankrupt should be sustained.