### In re SUTTER.

(District Court, E. D. Missouri, E. D.   December 29, 1920.)

No. 3337.

Bankruptcy ⬩⬩⬩68—Alleged bankrupt held "person engaged chiefly in farming."

An alleged bankrupt, who for 20 years had resided on a farm of 300 acres, a part owned by him and a part by his wife, during each of which years he cultivated and pastured all or the greater part of the land, and raised cattle and hogs, which he fed and marketed, *held* a "person engaged chiefly in farming," and under Bankruptcy Act, § 4 (Comp. St. § 9588), not subject to adjudication as an involuntary bankrupt, although he sometimes fed cattle which he bought and sometimes bought additional feed.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Farming.]

In Bankruptcy.   In the matter of John W. Sutter, alleged bankrupt. On involuntary petition.   Adjudication denied.

Fry & Fry, of Mexico, Mo., for petitioning creditors.

W. C. Hughes and Emil P. Rosenberger, both of Montgomery City, Mo., for answering defendant.

FARIS, District Judge.   The matter before me is a petition in involuntary bankruptcy.   Certain technical objections are raised by the creditors of Sutter, as also a question of fact, in opposition to his adjudication as a bankrupt.   After carefully considering the evidence adduced upon a hearing before a special commissioner appointed to take the testimony, I have reached the conclusion that no necessity exists for the consideration of the technical objections urged; for I am of the opinion that the question of fact raised will, when decided, dispose of the case.   This question of fact turns on the provisions of section 4 of the Act of July 1, 1898, c. 541, as amended by the Acts of February 5, 1903, and June 25, 1910 (Comp. St. § 9588). So much of said section as is apposite to the point urged reads thus:

"Any natural person, except * * *. a person engaged chiefly in farming or the tillage of the soil, * * * may be adjudged an involuntary bankrupt upon default or an impartial trial, and shall be subject to the provisions and entitled to the benefits of this act."

Therefore the question which arises upon the facts, as applied to the language of the statute above quoted, is whether John W. Sutter was, at the time he committed the alleged acts of bankruptcy, a "person engaged chiefly in farming or the tillage of the soil."   Sutter himself absconded on the 6th of July, 1920, and his whereabouts up to this hour are unknown.   Certain attaching creditors are, however, contesting his adjudication.   Since, as stated, I am of opinion that the determination of the question whether Sutter falls into the category excepted by the statute will be decisive, I lay aside for the present any consideration of the technical questions urged by the contesting creditors.

⬩⬩⬩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The facts adduced upon the trial were, substantially, that Sutter had for some 20 years resided with his family on a farm containing some 300 acres of tillable and pasture lands, situated about 4 miles north of Wellsville, in Montgomery county, Mo. Of this tract 100 acres belonged to his wife, but during the whole of his residence in Montgomery county the latter tract was used by him just as were the remaining 200 acres. In the year 1919, or in the early part of the year 1920, he sold 80 acres of this land. Before this sale he had either cultivated or pastured the whole of the 300 acres, and after the sale he had either cultivated or pastured the remaining 200 acres thereof, just as if he had owned the whole in fee.

Up to the year 1916 he had himself either cultivated or pastured the tract—the whole 300-acre tract—annually. After 1916, and up to the date that he left the country, he had rented to others, sometimes 40 acres per year, and sometimes 80 acres, and had received as rent thereon a part of the crops raised on the land so rented. On this farm, which is shown to have been rather larger than the ordinary farm in that community, he annually raised crops of corn, oats, and wheat. The wheat he sold, but the corn, the whole of it, and the oats, were fed by him to hogs and cattle, which he sold, when fat, in the markets either at St. Louis or in Kansas City. Some of these cattle and many of the hogs he raised himself. Some of them he purchased from neighboring farmers in the community. Many of the cattle he would buy as "feeders" in St. Louis, and perhaps in Kansas City. He seems to have fed to the stock thus purchased, not only all of the corn and oats raised by him on this farm, but to have bought from neighbors other corn, which he fed to hogs and cattle upon the place. In addition, the evidence shows that between October, 1918, and January, 1919, he purchased six cars of what is known as "commercial feed." A considerable part of this so-called commercial feed was, however, resold by him to his neighbors. Between June, 1918, and March, 1919, the evidence shows that he shipped 4 cars of hogs and 14 cars of cattle to either St. Louis or to the Kansas City markets, mostly to the former. He also shipped in April, 1919, two carloads of sheep; but the evidence shows that these sheep belonged to a neighbor, and were shipped by him in his own name for the purpose of getting some advantage, either in the freight rate or by way of return fare. The evidence shows, as to many of these carloads of hogs and cattle, either that some parts of the same belonged to his neighbors, or that he purchased them merely to fill out the carload.

The record goes no further back as to his financial dealings than the year 1916, in which year, by reason of the impossibility of securing labor for his farming operations, he seems to have been compelled to an extent to modify his farming methods. In 1916 he received from live stock commission companies, so far as the record discloses, only $294.30; in 1917, about $4,700; in 1918 about $4,300; and in 1919, $882. To these receipts, it is inferable, there should be added whatever deductions were made by these companies for money due them from Sutter for "feeders" sold him from time to time, the amounts whereof do not clearly appear from the evidence. His expenditures

for "feeders" bought from live stock commission companies, for hogs and cattle purchased from his neighbors, for corn also purchased from the latter, and for commercial feeds, largely exceeded the sums received by him for the sale of stock, so that he became rather heavily indebted; hence this proceeding in involuntary bankruptcy, and the numerous attachments which have been run upon his property.

The evidence is conclusive that good husbandry in the community in which he lived, the nature of the soil regarded, made it necessary for him to rotate the crops upon his farm, and to feed and pasture cattle thereon, in order that the fertility of the soil might be conserved. The evidence, is also conclusive that in this he followed the custom of other farmers in the community, who owned and operated farms of a similar size and consisting of similar soils. He bought, fed, and sold more cattle and hogs than the majority of his neighbors, but not as many as some of them. He also produced upon this farm fruit, garden vegetables, and poultry, all of which, however, seem to have been consumed by himself and his family. The question of law, therefore, arises upon these facts as to whether Sutter was a person engaged chiefly in farming. I conclude that he was, and that his estate is not subject to an involuntary proceeding in bankruptcy. In re Thompson (D. C.) 102 Fed. 287; In re Mackey (D. C.) 110 Fed. 355; Wulbern v. Drake, 120 Fed. 493, 56 C. C. A. 645; In re Dwyer, 184 Fed. 880, 107 C. C. A. 204; Harris v. Tapp (D. C.) 235 Fed. 918; Rise v. Bordner (D. C.) 140 Fed. 566. In the case of In re Mackey, supra, the court said:

"A person engaged chiefly in farming is one whose chief occupation or business is farming. The chief occupation or business of one, so far as worldly pursuits are concerned, is that which is of principal concern to him, of some permanency in its nature, and on which he chiefly relies for his livelihood, or as the means of acquiring wealth, great or small. That one may principally devote his physical exertions or his time to a given pursuit, while one of the factors entitled to consideration, is not in all cases determinative of the question whether that pursuit is his chief occupation or business. * * * If such dealing is of principal concern to him and chiefly relied on by him for his subsistence and financial advancement, and if he treats it as of paramount importance to his welfare, he would not be within the category of persons chiefly engaged in farming, even were his farm to yield him some profit. * * * It is evident that it is impracticable, if not impossible, to define with precision the facts which will in all cases determine whether one is engaged chiefly in farming, and that each case must be decided on its own circumstances. It may, however, legitimately be stated, generally, that, if it appears in a given case that one's occupation or business which is of principal concern to him, not ephemeral, but of some degree of permanency, and on which he mainly relies for his livelihood and financial welfare, be other than farming, he is not 'a person engaged chiefly in farming.' No one should be held exempt from the provisions of the bankrupt act on this ground unless it satisfactorily appears that he comes within the exception."

It is likewise said in Wulbern v. Drake, supra, ·

"It does not matter * * * if the person may have other business or other interests, if his principal occupation is that of an agriculturalist, if that is the business to which he devotes more largely his time and attention, which he relies upon as a source of income for the support of himself and family, or for the accumulation of wealth."

Petitioners urge upon me as conclusive the case of Bank of Dearborn v. Matney (D. C.) 132 Fed. 75. I am constrained to hold upon the facts at bar that Sutter does not fall within the facts, and so not within the rule enunciated, in the Matney Case. In that case Philips, J., said:

"The farmer may cultivate all or a part of his lands. He may be general or special. He may devote his cultivation to the production of corn, or wheat, oats, or rye, or grasses, whichever, in his judgment, may be the more useful or profitable. He may include also with these breeding, feeding, and rearing of live stock, embracing cattle, horses, mules, sheep, and hogs, for domestic use and for market. If he find it more profitable to feed his agricultural products or his grasses to live stock than to rely upon marketing the surplus, he may not be limited to the quantity of live stock for such purpose to what he may breed or rear on his farm. For this purpose he may rely entirely upon the purchase of such live stock from his neighbors or on the market and utilize his farm products in feeding and fattening such 'feeders' for market. Neither, in my opinion, should the act be so construed as to restrict the farmer entirely, under all circumstances, and conditions, to the corn and hay and grasses he may produce for rearing such feeders and preparing them for market. In other words, where he relies largely upon his pasture lands for grazing his cattle, and his crops of corn may not be sufficient to carry them through the particular winter and the feeding season, he may supplement these by purchasing from without sufficient corn, and the like, to meet the requirement. But certainly there should be apparent such relation between his method of farming, and the buying and feeding of cattle, hogs, and the like, for market, as to reasonably indicate that his farming is not made principally subsidiary to the business of buying and selling cattle. So that, if his chief business is that of thus trading in cattle, using his lands as a mere feeding station, relying upon the purchased feed from the market for preparing them for sale much more than on his agricultural products, he may cross the dividing line between farming as his chief business and trading in cattle as his chief source of livelihood. No hard and fast rule can safely be laid down by the courts indifferently applicable to all cases. Each must depend more or less upon its own particular facts."

Applying the facts as I find them to the rule as I gather it from the cases cited above, and distinguishing the case made from the facts in the Matney Case, I conclude that Sutter was a person, prior to his absconding, chiefly engaged in farming, and that he cannot be adjudicated a bankrupt upon an involuntary proceeding, as here sought. The adjudication of his estate as a bankrupt will therefore be denied.