In re WAKEFIELD.

(District Court, N. D. California.   September 20, 1910.)

No., 5,560.

BANKRUPTCY (§ 68*)—PERSON SUBJECT TO ADJUDICATION—"WAGE-EARNER."

Where an alleged bankrupt had engaged in a mercantile business in which he had contracted debts, and thereafter acquired property by inheritance, worth $40,000, which he immediately assigned to his brother for $180, and during the year the assignment was made received wages for his services exceeding $1,500 per annum, he was not a "wage-earner," exempt from bankruptcy adjudication, under the provision of the bankruptcy act authorizing an adjudication against any natural person, except a wage-earner, defined to be an individual working for wages at a rate not exceeding $1,500 per year.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 68.*

For other definitions, see Words and Phrases, vol. 8, p. 7365.]

In the matter of bankruptcy proceedings against Franklin W. Wakefield.   On objections to adjudication.   Overruled.

James P. Sweeney, R. H. Cross, J. C. Campbell, and Joseph P. Lucey, for petitioners.

W. F. Williamson, Aitken & Aitken, Stanley Moore, and W. H. Orrick, for bankrupt.

FARRINGTON, District Judge.   While Franklin W. Wakefield was president, manager, and principal stockholder of Beck-Wakefield Company, that corporation sold goods on written contracts to be paid by the purchaser in monthly installments.   A number of these contracts were sold to W. A. Houts on terms which bound the company to make good to Mr. Houts the amounts unpaid.   It was also agreed that Mr. Wakefield should collect moneys due on these contracts for Mr. Houts.   The answer admits that upward of $15,000 was so collected, but Mr. Wakefield denies that he failed or refused to pay over such money.   It is claimed that Mr. Wakefield guaranteed Beck-Wakefield's contracts with Mr. Houts, and that he is also liable as a stockholder for a large portion of the indebtedness due from that corporation to Mr. Houts.

Beck-Wakefield Company was adjudged bankrupt September 17, 1906.   About one month later Mr. Wakefield entered into a tentative agreement with George A. Moore & Co. for the purchase of a block of Moore-Doty Company stock.   The terms and character of this agreement are shown in the following letter:

"San Francisco, October 15, 1906.

"Mr. Franklin W. Wakefield, San Francisco—Dear Sir:   Following the several interviews which we have had relative to your buying an interest in the Moore-Doty Company's business in Tahiti, we herewith embody what we understand to be our mutual agreement in regard to this matter.

"It is and must be for the present informal, inasmuch as it is impossible at the present time to determine the value of the assets of the company, and this is merely to put in writing what we have concluded verbally between ourselves.

"'Geo. A. Moore & Co. have this day sold, and Franklin W. Wakefield has purchased, two hundred and fifty-five (255) shares of the capital stock of the

Moore-Doty Company, a corporation duly organized and existing under the laws of California, at $100.00 per share, on the following terms and conditions:

" 'Mr. Wakefield has deposited with Geo. A. Moore & Co. in payment of the above his several promissory notes as follows:

| | | |
|---|---|---|
| #1......................$2,500 00.....................May 15, 1907 |
| 2...................... 2,500 00.....................Nov. 15, 1907 |
| 3...................... 2,500 00.....................May 15, 1908 |
| 4...................... 2,500 00.....................Nov. 15, 1908 |
| 5...................... 2,500 00.....................May 15, 1909 |
| 6...................... 2,500 00.....................Nov. 15, 1909 |
| 7...................... 2,500 00.....................May 15, 1910 |
| 8...................... 2,500 00.....................Nov. 15, 1910 |
| 9...................... 2,500 00.....................May 15, 1911 |
| 10...................... 2,500 00.....................Nov. 15, 1911 |
| 11...................... 500 00.....................Nov. 15, 1911 |

" 'And Geo. A. Moore & Co. have delivered to him two hundred and fifty-five (255) shares of the Moore-Doty Company, with the understanding that as soon as possible a careful inventory will be made of the assets of the Moore-Doty Company. If it is shown that the assets are over $50,000.00 or $100.00 per share, there being 500 shares in the company, then Mr. Wakefield agrees to pay to Geo. A. Moore & Co. 255/500 of the excess; should they be less, Geo. A. Moore & Co. agree to refund 255/500.'

"We are writing to Mr. Searby by this opportunity to have a statement of the condition of the Moore-Doty Company made out as soon as possible to determine the value of the shares hereby purchased and sold.

"It is understood that of these notes so deposited by Mr. Wakefield, numbers 5 to 11, amounting to $15,500.00 in all, will be held by us until the completion of the inventory and the determination of the assets of the concern. Should it be shown on such determination that 255/500 of the assets is less than the amount of all the notes mentioned above, then we agree to return the amount of notes in excess of such figure.

"Yours very truly,          Geo. A. Moore & Co., Geo. A. Moore, Pt."

November 1, 1906, Mr. Wakefield became manager for Moore-Doty Company in Tahiti. June 18, 1907, James McDonald died intestate in California, leaving a large and valuable estate. Franklin W. Wakefield was one of his heirs, and on the 21st day of August assigned all his interest in the personal property of that estate to his brother, Samuel Bell Wakefield. This transfer is found by the jury to have been made with intent to hinder, delay, and defraud the creditors of the respondent. The jury also found that on the 19th day of December, 1907, the day when the petition in involuntary bankruptcy was filed, the petitioner, W. A. Houts, had a provable claim against Franklin W. Wakefield, amounting in the aggregate to more than $500 in excess of the securities held by him, and that Mr. Wakefield on that date owed debts to the amount of $1,000 or more. The jury also found that Mr. Wakefield, on the 21st day of August, 1907, the day of the assignment, was not a wage-earner.

Respondent now urges the court to deny an adjudication, to set aside the verdict in so far as it finds that Mr. Wakefield was not a wage-earner, and to dismiss these proceedings, because the verdict is advisory merely, and because it is contrary to the testimony, and to the court's instructions.

The only question to be determined is as to whether the alleged bankrupt is a wage-earner within the meaning of the bankruptcy act. Neither party was entitled, as of right, to have this particular issue deter-

mined by a jury. Whether it should be so determined was a matter wholly within the discretion of the court. Having been submitted, the resulting verdict is at best but advisory. Carpenter v. Cudd, 174 Fed. 603, 98 C. C. A. 449.

From November 1, 1906, to January 1, 1908, Franklin W. Wakefield was in the employ of Moore-Doty Company. Mr. Moore, the president of that corporation, on the witness stand stated that Mr. Wakefield's salary during that period was $150 per month; later, on cross-examination by respondent, after being shown a copy of an account between Mr. Wakefield and the company, he stated that his first answer was a mistake, and that the salary was but $125 per month. Mr. Searby, treasurer of the company, says the salary was but $125 per month. Mr. Wakefield says the same, and in a letter to Mr. Moore, dated January 12, 1907, Mr. Wakefield says:

"I have credited myself with $125 a month, as this is about what I will need here, and when the business is on its feet, and paying, I will draw $150 a month, with your permission."

The account shown to Mr. Moore was admitted in evidence, and from this it appears that Mr. Wakefield was credited with:

"Wages, Nov. & Dec. 1906, at $150............................ $300."

January 17, 1907, Mr. Wakefield is debited with an excess in these words:

"Should be credited Dec. 31 with salary at only $125, 2 months at 25 ..................................................................$50."

For January, February, March, and April Mr. Wakefield is credited with but $125 per month wages. For May and June he is credited with $150 per month, and on July 6th he is debited 260.62 francs in these words:

"To (cash) expense diff. in wages should only be $125 for May & June."

July 31st he is credited with $150 salary. For the remaining months of the year, August, September, October, November, and December, he is credited with $200 per month. March 24, 1908, he is debited with $25 excess credit for salary in July, 1907, and with $150 excess credit for salary in August and September, 1907, "as per Mr. Wakefield's letter of Jan. 12th/07 to Geo. A. Moore."

For the year 1907 Mr. Wakefield was credited in the aggregate for salary with $1,950. Subtracting the corrections for May, June, August, and September, amounting to $225, from this sum, the remainder, $1,725, is apparently his salary for the year 1907. The total over-credit for the 14 months is $275, none of which was ever repaid by Mr. Wakefield.

The first correction was made January 17, 1907, and within three weeks after the excessive charge for November and December. The second was made July 6th, and within one week after the excessive charge for May and June. The last correction, however, was not made until March 24, 1908, nearly six months after the original charge for August and September. When the last correction was made the salary of $200 per month for October, November, and December, 1907, was allowed to stand.

James McDonald died intestate June 18, 1907. Samuel Bell Wakefield went from San Francisco to Tahiti in the following August, and brought with him the news that Franklin's interest in the estate was worth about $40,000. He remained in Tahiti but four days, and returned with an assignment from Franklin of all the latter's interest in the personal property of the estate. Franklin W. Wakefield received but $180 for this assignment. December 19th of the same year Mr. Houts filed his petition, praying that Franklin W. Wakefield be adjudged a bankrupt. This petition was filed just before the expiration of the four months fixed by the statute as the time within which the assignment could be used as the basis of an involuntary proceeding in bankruptcy. It is very significant that within three months after the petition was filed, and about six months after Mr. Wakefield was credited with $150 salary for July, $200 for August, and $200 for September, Mr. Wakefield was debited with $125 to make his salary for those three months but $125 per month. Previous corrections, as the account shows, had been made almost immediately after the excessive credit for wages was given. This time nearly six months elapsed before any correction was made.

Mr. Moore testified that these corrections were made without reference to the bankruptcy proceedings. He also testified that the account was correct, and that the aggregate wages for the year did not exceed $125 per month; and yet it is shown to my entire satisfaction that Mr. Wakefield actually received $1,950 for the year's services, none of which was ever returned, and only $225 was charged back on the books of the company. Whether consciously made for this purpose or not, the corrections are so timed as to cover the period prior to the assignment, the month in which the assignment was made, and the month in which the assignment probably could have been recorded in San Francisco. If the corrections had no reference to the bankruptcy proceedings, it is rather a remarkable coincidence that Mr. Wakefield was allowed $200 per month salary for the remainder of the year 1907. The effect and the result of all these arrangements is the same as though they had been designed for the express purpose of defeating bankruptcy proceedings; and now, if these proceedings are dismissed, the statute of limitations will have barred all or nearly all of the claims against Mr. Wakefield.

It certainly was not the intention of the lawmakers to so frame the bankruptcy act as to put it in the power of an insolvent merchant to bring to naught by timely change of occupation all efforts by creditors to have his debts and property administered upon in a bankruptcy court.

"Any natural person, except a wage-earner or a person engaged chiefly in farming or in the tillage of the soil * * * may be adjudged an involuntary bankrupt."

A wage-earner is defined by the bankruptcy act itself to be an "individual who works for wages, salary, or hire at a rate of compensation not exceeding $1,500 per year."

The act does not fix the time when the status of the individual as a wage-earner is to be determined. In many of the cases it has been de-

termined by the vocation of the individual when the act of bankruptcy was committed. In re Crenshaw, 156 Fed. 638; Flickenger v. First National Bank, 145 Fed 162, 76 C. C. A. 132.

Judge Toulmin, in Re Crenshaw, supra, says:

"The exemption from involuntary proceedings in favor of wage-earners is not intended as a means of escape for insolvents whose property was acquired and whose debts were incurred in other occupations recently engaged in."

"No construction of the bankruptcy act," says the court in Re Mackey, 110 Fed. 355, 361, "is admissible which would permit an insolvent person, who had committed an act of bankruptcy within four months next preceding the filing of the petition, to evade the provisions of the statute by engaging in farming after the commission of the act and before the filing of the petition."

In Re Burgin, 173 Fed. 726, the court held that the status of the alleged bankrupt as to his occupation is to be determined as of the period when he contracted the debts to be proved and acquired the property to be administered, and, where he was at that time engaged in mercantile pursuits, he cannot defeat the operation of the law by thereafter engaging in an exempt occupation.

In Tiffany v. Condensed Milk Co., 141 Fed. 444, a corporation engaged in liquidating its affairs resisted a petition filed by its creditors, contending that it could not be adjudged a bankrupt, because it was no longer engaged in manufacturing, trading, printing, publishing, mining, or mercantile pursuits. After an exhaustive discussion of the cases, Judge Archbald says:

"While neither of the authorities so cited may be in exact correspondence with the case in hand, the principle to be deduced from them, applicable thereto, is clear. The liability of a person, whether natural or artificial, to bankruptcy, is to be judged by the character of the pursuit in which such person was engaged at the time the debts due the petitioning creditors were incurred, with respect to which it may be conceded that, as to a corporation, its actual business is to be considered, and not that which it might possibly have undertaken by virtue of authorized, but unexercised, powers. In re New York & W. Water Co., 3 Am. Bankr. Rep. 508, 98 Fed. 711; In re Tontine Surety Co., 8 Am. Bankr. Rep. 421, 116 Fed. 401. As to such debts, an individual does not lose his previous character by ceasing to carry on the business in which they were contracted and turning to another, in which he is not liable to bankruptcy, and neither does a corporation, by stopping business altogether and going into liquidation, voluntary or involuntary. In either case, as to debts previously contracted, the business character of such person, in the contemplation of the law, remains the same."

In Re Duquesne Brewing Co., 177 Fed. 609, the Circuit Court of Appeals held that a corporation organized to manufacture beer was engaged principally in manufacturing, and subject to adjudication as a bankrupt, even before its plant had been completed, or any machinery purchased, or any beer actually made.

The idea runs through all the cases above cited that involuntary proceedings are in no sense optional with an alleged bankrupt. An involuntary petition is filed by creditors, not by the debtor. The purpose of the law was to put into the hands of creditors, where proper conditions exist, the power to force their debtor into bankruptcy, even against his will.

In the case at bar the debts were incurred in a mercantile pursuit; the property sought to be administered upon in bankruptcy will come,

if at all, by inheritance. Furthermore, the assignment which consti-
tutes the act of bankruptcy was an assignment, not of earnings, but
of an inheritance.

The bankruptcy act makes no exception in favor of debts so con-
tracted or of property so acquired. A construction of the statute
which would permit an insolvent under such conditions to avoid bank-
ruptcy proceedings, because at the time the act was committed, or at
the time when the petition was filed, he was working at a salary of
less than $1,500 per year, seems to me to be wholly at variance with
the spirit of the act, and to put it within the power of every insolvent
to defeat involuntary proceedings initiated by his creditors.

The reasoning which justifies a construction of the statute which
will not permit an individual who has acquired property and incurred
debts as a merchant to avoid bankruptcy by becoming a wage-earner,
either before or after an act of bankruptcy, applies with equal force
to one who contracts debts in one nonexempt occupation, acquires
property in another, and seeks to avoid an application of the statute
to such debts and property by claiming that the act of bankruptcy was
committed while he was a wage-earner.

In the present case Franklin W. Wakefield's debts were created in
a mercantile business. The property sought to be administered in the
bankruptcy court was not the product of his labor; and the wages col-
lected and allowed for the year 1907, when the act of bankruptcy oc-
curred, exceeded $1,500 per annum.

I can neither set aside nor ignore the verdict of the jury. I shall
therefore find the respondent, Wakefield, was not a wage-earner with-
in the provisions of the bankruptcy act.

An order adjudicating the respondent an involuntary bankrupt will
be entered.