## HARRIS et al. v. TAPP.

(District Court, S. D. Georgia. September 6, 1916.)

1. BANKRUPTCY ⊂⊃68—EXEMPTION FROM INVOLUNTARY PROCEEDINGS—DATE OF FIXING STATUS.

The status of an alleged bankrupt as to his occupation is to be determined as of the date when the acts of bankruptcy charged were committed, unless the application of a different rule is required to prevent fraud, as where the debts to be proved were contracted and the property to be administered was acquired while he was engaged in a recent nonexempt occupation, which he afterward changed to an exempt occupation, in which case he will be held estopped to set up the exemption.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 18, 86, 87; Dec. Dig. ⊂⊃68.]

2. BANKRUPTCY ⊂⊃68—PERSONS SUBJECT TO INVOLUNTARY PROCEEDINGS— PRINCIPAL OCCUPATION—"CHIEFLY ENGAGED IN FARMING."

An alleged bankrupt committed the acts charged as acts of bankruptcy about October 1st. Until September he had been cashier of a bank at a salary of $1,380 per year. During the season, as for the preceding four or five years, he had operated a farm of about 500 acres two miles from the town. Until about a year before, he owned 380 acres of the farm, which he then sold, reserving its use for the next season. On the farm he employed 12 men, including a manager, and owned the equipment for running the same, consisting of horses, mules, and implements, and also all of the property thereon, consisting of live stock, grain, hay, cotton, etc. He boarded in the town, but visited the farm once or more each week, and directed its management. He also owned an interest in two or three corporations or firms, but gave them little personal attention, and received no profit therefrom. *Held*, that such facts supported a finding by the referee that he was "engaged chiefly in farming," and was exempt

from involuntary bankruptcy proceedings, under Bankr. Act July 1, 1898, c. 541, § 4b, 30 Stat. 547 (Comp. St. 1913, § 9588).

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 18, 86, 87; Dec. Dig. ☞68.]

3. BANKRUPTCY ☞68—PERSONS SUBJECT TO INVOLUNTARY PROCEEDINGS—PRINCIPAL OCCUPATION.

Where an alleged bankrupt is engaged in several occupations at the same time, what constitutes his principal occupation is to be determined from all the circumstances of the particular case.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 18, 86, 87; Dec. Dig. ☞68.]

In Bankruptcy. In the matter of E. A. Tapp, as involuntary bankrupt. Petition of W. M. Harris and others for the adjudication. On exceptions by petitioners to report of referee. Exceptions overruled, and petition dismissed.

On the 29th day of November, 1915, Mrs. W. M. Harris, W. M. Harris, and Sutton & Purvis filed an involuntary petition in bankruptcy against E. A. Tapp, alleging in brief that the said Tapp for the greater portion of six months next preceding the date of the filing of the petition had his principal place of business and resided in Ocilla, Irwin county, Ga., and that they had provable claims against him amounting in the aggregate, in excess of securities held by them, to more than $500; the claim of Mrs. W. M. Harris consisting of a note for $1,600, dated January 31, 1914, and due January 1, 1915, the claim of W. M. Harris consisting of an open account in the sum of $45 against the defendant, assigned to him by one Thomas Cribb, and the claim of Sutton & Purvis consisting of a promissory note dated November 17, 1913, on which there was a balance due of $97.20. Petitioners alleged that said Tapp was insolvent, and that within four months next preceding the filing of the petition he committed three acts of bankruptcy, to wit: That on the 28th day of September, 1915, he executed to the First National Bank of Ocilla a mortgage for the sum of $7,166.44, principal, upon certain personal property, to wit, 12 mules and 3 horses (describing same), and also 20 head of stock cattle, and that on the 5th day of October, 1915, he transferred to one D. L. Rogers a certain automobile, and that on the 4th day of October, 1915, he transferred to the Irwin County Produce Company 2,000 bushels of corn and 100 tons of hay; that at the time of making said transfers said Tapp was insolvent, and that said transfers were made with intent to prefer said creditors over his other creditors, and with intent to hinder, delay, and defraud his other creditors. Petitioners further alleged that said Tapp on the 5th day of November, 1915, had absconded, and had since that time concealed himself, and that his whereabouts were unknown. They also alleged that "for the greater part of six months next preceding the date of the filing of the petition said Tapp was cashier of the First National Bank of Ocilla, and that during said period his principal occupation was being cashier of said bank, and that during said period the said Tapp was also engaged in the business of running a gristmill and in the mercantile business under the name of the Irwin County Produce Company, located in Ocilla, and that the said Tapp was also engaged in the fire insurance business in Irwin county during a greater portion of said period; that the salary of the said Tapp as aforesaid was more than $1,500 per year, and that he was not and is not a wage-earner or chiefly engaged in farming."

Subpœna issued for said Tapp, but he was not located by the marshal, but was served by publication. On November 29th petitioning creditors filed a petition for a receiver, alleging that the estate of the bankrupt consisted of 15 head of mules and horses, 2,000 bushels of corn, 100 tons of hay, 250 head of hogs, one automobile, and real estate in and near Ocilla; and a receiver was duly appointed on the same date to take charge of said estate and preserve same, as provided by law. On the 20th day of December, 1915, petition-

ing creditors and the receiver of Tapp's estate filed a petition, in which they alleged: That the receiver had ascertained that there was located upon the farm near Ocilla, Ga., which had been formerly owned by the said Tapp, and which had been operated and cultivated under his direction during the year 1915, certain property, to wit, 177 head of hogs, 12 head of stock cattle and 6 calves, 10 head of mules and 2 horses, 500 bushels of corn in the ear, 9 stacks of oats, 1,100 bales of oat straw in barn, three-fourths of an acre of sweet potatoes in the field, 16 sacks of guano, 1 threshing machine, one mowing machine, 3 two-horse wagons, 5 guano distributors, 8 one-horse disc turn plows, 8 plow stocks, 4 two-horse turn plows, 8 sets of plow harness, 3 sets of two-horse wagon harness, 1 mowing machine, 1 hay rake and 100 bales of hay in barn, 20 tons of hay in barn not baled, 100 stacks of hay in field, all of which was alleged to be the property of said Tapp. That on the 9th day of September, 1914, the said Tapp owned 24 shares of stock in the Farmers' Warehouse & Gin Company, a corporation at Lax, Irwin county, Ga., and also one-third interest in the Irwin County Produce Company, a partnership, and also certain live stock of the value of $2,500, as described in the mortgage to the First National Bank of Ocilla above mentioned, and that he also owned one-half interest in certain city lots in Ocilla of the approximate value of $800, also mortgaged to the First National Bank of Ocilla; also one-half interest in certain real estate, of the value of $3,000, held by said Tapp under a bond for title, which was transferred to the First National Bank of Ocilla, and also certain other real estate, of the value of $1,000, which was conveyed to the First National Bank of Ocilla; also a certain automobile of the value of $200. They alleged that on the same day the said Tapp was also in possession of 1,000 bushels of corn in the ear, of the value of $750, and 75 head of hogs, not above mentioned, of the value of $750, which property the said Tapp had transferred to the Irwin County Produce Company. They further alleged that the corn, hay, and hogs, except those which had been delivered to the Irwin County Produce Company, were claimed by J. E. Howell, that the horses, mules, and cattle were claimed by the First National Bank of Ocilla, by virtue of a mortgage held by said bank against the same, that the 1,000 bushels of corn were claimed by the Irwin County Produce Company, and that the automobile was claimed by one D. L. Rogers. Petitioners further alleged that said various claimants to said property were preparing to dispose of same and place same beyond the reach of the receiver, and prayed for an injunction against said claimants restraining them from transferring, selling, or otherwise disposing of said property. A temporary restraining order was granted upon said petition.

Said Tapp never filed any appearance or defense to the involuntary petition in bankruptcy so filed against him, or against any of the other proceedings in the case. However, on the 15th day of December, 1915, certain creditors, to wit, the First National Bank of Ocilla, the McAllister-Cook-Branch Company, a corporation, J. E. Howell, and Mrs. Mary E. Howell, filed their answer to the petition in bankruptcy against said Tapp, and objected to his adjudication. They denied that said Tapp was insolvent, or that he had committed any of the acts of bankruptcy alleged against him. They admitted that said Tapp had absconded, and that his whereabouts were unknown. They admitted that for the greater part of six months next preceding the date of the filing of the petition said Tapp was cashier of the First National Bank of Ocilla, but denied that during said year his wages amounted to as much as $1,500 per year, and denied that his principal occupation was that of cashier of said bank. They denied, also, that during the period aforesaid said Tapp was engaged in the business of running a gristmill, or in the mercantile business, or in the fire insurance business, as alleged in said petition. They denied that said Tapp "was not and is not a wage-earner," and denied that he "was not chiefly engaged in farming." They averred that Tapp's wages as cashier were $115 per month, or $1,380 per year, and that he was a wage-earner within the meaning of section 4b of the national Bankruptcy Act, and they also averred that said Tapp was engaged chiefly in farming or the tillage of the soil within the meaning of the same section, and that for said reasons he could not be legally adjudged a bankrupt upon the involuntary petition so filed against him. Said responding creditors also

filed their answer to the petition for injunction above mentioned, in which they averred that the transfers which were attacked by the petitioning creditors were not preferential in their nature, and were not made to hinder, delay, or to defraud creditors, but were made bona fide for a present fair consideration; that the interest which said Tapp was alleged to have in the corporations mentioned in the petition was worthless, and that his interest in some of the real estate referred to in the petition was covered by outstanding valid mortgages and security deeds to the Calvert Mortgage & Deposit Company, of Baltimore, and other loan companies, and that his equity in same was valueless, and that he had no interest whatever in the remainder of the real estate described in the petition.

Thereafter the issue made by the involuntary petition in bankruptcy and the defense filed thereto by the objecting or responding creditors was referred to Jas. F. McCrackin, Esq., one of the referees in bankruptcy of the court, as special master, who had several hearings upon same. At one of these hearings, two other creditors of the alleged bankrupt, to wit, Wilcox, Ives & Co. and T. M. Purvis, duly filed their intervention, and were allowed to join in the involuntary petition aforesaid, asking for the adjudication of said Tapp. The said Wilcox, Ives & Co. held a note against said Tapp, dated April 29, 1914, upon which there was a balance due of $400, and the said T. M. Purvis held a note against said Tapp for the sum of $200, dated December 10, 1914.

The special master duly filed his report, accompanied by a transcript of the evidence in question and answer form, consisting of 157 typewritten pages, and also a summary of said evidence, consisting of 45 pages, together with the documentary evidence introduced on the hearing of the matter. The special master found with the petitioning creditors as to the insolvency of the defendant, and as to the right of the petitioning creditors to file the petition, and he also found that the mortgage upon the live stock executed by the defendant on the 28th day of September, 1915, to the First National Bank of Ocilla, was an act of bankruptcy; that the transfer by defendant of the automobile to D. L. Rogers on the 5th day of October, 1915, was not an act of bankruptcy; and that the transfer of the corn and hay to the Irwin County Produce Company on the 4th day of October, 1915, was an act of bankruptcy. However, the special master, after reviewing the evidence, concluded that the defendant was chiefly engaged in farming or the tillage of the soil within the meaning of section 4b of the Bankruptcy Act, and therefore was not subject to adjudication, and recommended that the objections of the responding creditors be sustained and the petition dismissed. To this report the petitioning and intervening creditors duly filed their exceptions, alleging that the special master erred in finding that the defendant, Tapp, was engaged chiefly in farming or the tillage of the soil, and contending that the evidence taken as a whole showed that the defendant was not chiefly engaged in farming or the tillage of the soil, either at the time when the debts of petitioning and intervening creditors were contracted, or at the time of the commission of the acts of bankruptcy, or at the time of the filing of the involuntary petition in bankruptcy against him.

Quincey & Rice, of Ocilla, Ga., and Patterson & Copeland, of Valdosta, Ga., for petitioning creditors.

E. K. Wilcox, of Valdosta, Ga., and Rogers & Rogers, of Ocilla, Ga., for objecting creditors.

LAMBDIN, District Judge (after stating the facts as above). This matter is now before me upon exceptions filed by the petitioning creditors to the report of the special master, in which he found that the alleged bankrupt was chiefly engaged in farming or the tillage of the soil, and therefore not subject to adjudication. The alleged bankrupt absconded about the 5th day of November, 1915, and has not since been heard from, and the involuntary petition in bankruptcy was filed against him on the 29th day of November, 1915, to which he made no

response, and the contest here is between two sets of creditors, one claiming that he is subject to adjudication upon their petition, and the other claiming that he is not—all the other questions in the case having been resolved by the special master in favor of the petitioning creditors.

The question raised by the exceptions is a close one and not free from difficulty. The evidence in the case disclosed the following facts: During the year 1915, the defendant, Tapp, had a great many "irons in the fire." He had been cashier of the First National Bank of Ocilla for four or five years, and had also owned and operated a farm for the same period, consisting of 380 acres, about two miles from Ocilla, Ga. In December, 1914, he had sold this farm, but had reserved the right to use and operate the same for the year 1915. In addition to this farm, he had rented for the year 1915 what is known as the Sintell place, consisting of 125 acres. The two tracts of land joined each other, and were operated during the year 1915 by an overseer under the direction and control of the defendant. He ran 10 plows, and regularly employed 11 laborers on this farm, and had ample farming implements, consisting of plows, both single and two-horse plows, wagons, hay rake, five guano distributors, stump pullers, a mowing machine, a threshing machine, and other necessary farming implements. There were six tenant houses on the farm, and two large dwellings; but the defendant, who was not a married man, boarded in Ocilla. He raised on this farm during the year 1915 the usual farm crops, including corn, cotton, oats, hay, peas, velvet beans, watermelons, cantaloupes, sugar cane, potatoes, etc. During said year, he raised 5,000 or 6,000 bushels of oats, from 900 to 1,500 bushels of corn, between 40 and 50 bales of cotton, some 600 or 800 bales of oat straw, a lot of peanuts, velvet beans, sugar cane, and potatoes, and he also raised and shipped 1½ cars of watermelons and 2½ cars of cantaloupes. He had on the farm over 200 head of hogs, 10 or 12 head of cattle, 10 mules, and 2 horses. After Tapp left the country, on November 5, 1915, all the hay, corn, and other stuff was still on the farm, except what had been sold to the Irwin County Produce Company, and likewise all the farming implements, mules, cows, horses, and hogs, which fact is also shown by the petition which the creditors filed, asking for the appointment of a receiver to take charge of said property. After Tapp left, there were also on hand some 8 bales of cotton, which had been picked out, and 1,900 or 2,000 pounds of seed cotton in the field, which were subsequently ginned and sold.

During the year 1915, he was also cashier of the First National Bank of Ocilla, as he had been for several years previously; but he resigned in August, and was relieved from his duties as cashier on September 7th. For the year 1914 he was paid a salary of $150 per month, but on January 1, 1915, his salary was reduced to $115 per month, and so remained until he left the bank in September. The defendant also had 24 shares of stock in the Farmers' Warehouse & Gin Company, of Lax, Ga., being treasurer of the company, but did not manage the business, or have anything to do with its management. He helped to finance the company by securing a loan to it from his

bank. The stock in the company was worthless. It does not appear when this company was organized.

Tapp was also a member of a firm called the Irwin County Produce Company, the other members being D. L. Rogers and J. R. York. This company was formed on March 1, 1915, and the real purpose of the company, as shown by the evidence, was to handle the produce from Tapp's farm. Each partner paid in $50 apiece. The company also handled guano, taking same on consignment from the wholesale dealers, and selling same to farmers, about $9,000 or $10,000 worth of guano being thus sold. Mr. York managed the business entirely, and no profits were ever made by the company. In August, 1915, Tapp sold his interest in the Irwin County Produce Company to J. R. York, with the exception of his responsibility to the guano companies; but afterwards he transferred a lot of corn and hay to the Irwin County Produce Company in consideration of their relieving him of responsibility to the guano dealers. After Tapp severed his connection with the bank, the only service he rendered the Produce Company was to aid in the collection of the outstanding guano notes. He stated to Mr. York, the manager of the company, that he would be in Ocilla for something like two or three months, and he agreed to aid in the manner aforesaid at a nominal salary of not over $40 per month.

He was also connected with what was known as the City Loan & Insurance Company, which was a partnership composed of Tapp and one Roy Cadwell. This company acted as agent in writing insurance and in negotiating loans, but only made a few loans, not over 10 or 12. The company did not do much business, and Mr. Tapp gave no attention to the business, and received no income from same.

[1] 1. Such in brief were the pursuits and activities of the defendant, and the question to be decided by the court is whether the defendant was a wage-earner, or chiefly engaged in farming or the tillage of the soil, so as to exempt from adjudication, within the meaning of section 4b of the Bankruptcy Act. The first question is as to when the status of the alleged bankrupt is to be determined, whether at the time the petition was filed, or at the time the acts of bankruptcy were committed, or at the time the debts of the petitioning creditors were contracted. The language of section 4b of the Bankruptcy Act is as follows:

"Any natural person, except a wage-earner or a person engaged chiefly in farming or the tillage of the soil, any unincorporated company, and any moneyed, business, or commercial corporation, except a municipal, railroad, insurance, or banking corporation, owing debts to the amount of one thousand dollars or over, may be adjudged an involuntary bankrupt upon default or an impartial trial, and shall be subject to the provisions and entitled to the benefits of this act."

This section is silent as to when the status of the person proceeded against in involuntary proceedings is to be determined, and the authorities are not uniform on this point—some courts holding one way and some another. See Collier on Bankruptcy (10th Ed.), pages 127, 128 and 129, and cases cited in notes. Some courts of high authority hold that the liability of the defendant to adjudication in involuntary proceedings depends upon his occupation at the time his indebtedness

was contracted. The District Court in Pennsylvania in the very well reasoned case of Tiffany v. La Plume Condensed Milk Co., 141 Fed. 444, 15 Am. Bankr. Rep. 413, took this position, as also did the District Court in California (In re Wakefield, 182 Fed. 247, 25 Am. Bankr. Rep. 118), and the District Court in Alabama (In re Crenshaw, 156 Fed. 638, 19 Am. Bankr. Rep. 502, and In re Burgin, 173 Fed. 726, 22 Am. Bankr. Rep. 574). There is much force in the reasoning of these distinguished courts in each of the cases above cited, and in the particular cases there involved, no doubt the decisions rendered were sound. As stated by Judge Grubb (In re Burgin, supra):

"The status of an alleged bankrupt as to his occupation is to be determined as of the period when he contracted the debts to be proved and acquired the property to be administered, and, where he was at that time engaged in mercantile pursuits he cannot defeat the operation of the law by thereafter engaging in an exempt occupation."

The view that the status of the alleged bankrupt is to be determined as of the date when his debts were contracted is not, however, the general rule on the subject, but is, in our opinion, only to be adopted when the equities of the case require such a construction, being based on the equitable idea that the exemption from involuntary proceedings allowed by the statute was not intended as a "means of escape for insolvents whose property was acquired and whose debts were incurred" in a recent nonexempt occupation. In such a case, upon the doctrine of estoppel, the bankrupt should not be heard to set up such exemption. The bankruptcy law should not be made an instrument of fraud. However, in this case under consideration, it does not appear that the debts owed by the defendant were contracted or the property sought to be administered was acquired while Tapp was pursuing a nonexempt occupation.

Bankruptcy proceedings are drastic in their nature, as they consign the bankrupt to a civil death and then administer the estate of the deceased, and therefore the jurisdiction of the court over the alleged bankrupt should be made clearly to appear before an adjudication can be made. The burden is on the petitioning creditors to show that the defendant is subject to adjudication. So far as appears to the court from the evidence in the case, the property which the court is asked to administer consists chiefly, if not entirely, of property connected with the farming operations of the defendant, namely, a lot of horses, mules, hogs, cattle, corn, hay, oat straw, and other farm produce, and a large lot of farming implements, etc. Nor does it appear that the debts contracted by the defendant were contracted while he was engaged in a nonexempt occupation or in the furtherance of such an occupation. The purpose for which the debts of the original petitioning creditors were incurred does not appear from the evidence, nor does it appear why the defendant incurred the indebtedness due to T. M. Purvis, one of the intervening creditors. It appears from the evidence that the debt due to Wilcox, Ives & Co. was for guano, and that one-half of this guano was used on defendant's farm. It appears from the evidence that the indebtedness due to the McAllister-Cook-Branch Company, one of the responding creditors, was for farming implements

bought by defendant for use on his farm, and the indebtedness due to the First National Bank of Ocilla was for a shortage while he was cashier of that bank, and the other debts appearing in the record against the defendant were for various forgeries and defalcations committed by him, and for which indictments were found, but it does not appear how the money raised by these illegal acts was used. In order for the petitioning creditors to take advantage of the equitable principle of estoppel laid down by Judge Grubb in the Burgin Case, it is necessary for them to show clearly that the defendant contracted the debts due by him and acquired the property sought to be administered by the court while he was in a nonexempt occupation, and this, in the opinion of the court, they have failed to do.

The court is of the opinion, however, that, as a general rule, the status of an alleged bankrupt should be determined with reference to his occupation at the time the alleged act of bankruptcy is committed. Such is the ruling of the Circuit Court of Appeals of the Sixth Circuit in the case of Flickinger v. First National Bank of Vandalia, 145 Fed. 162, 76 C. C. A. 132, 16 Am. Bankr. Rep. 678, in which Circuit Judge Severens, speaking for the court, said:

"A majority of the court is inclined to think that the statute should be regarded as having reference to the conditions existing at the time when the act of bankruptcy is committed."

The Circuit Court of Appeals in this case reversed on appeal an order of the District Court below, adjudging Flickinger a bankrupt. The petitioning creditors applied to the Supreme Court of the United States for a writ of certiorari to the Circuit Court of Appeals, which writ was denied, as may be seen by reference to First Nat. Bank of Vandalia v. Flickinger, 203 U. S. 595, 27 Sup. Ct. 783, 51 L. Ed. 332. The law on this point may therefore be regarded as settled, as the above-stated ruling of the Circuit Court of Appeals of the Sixth Circuit had the sanction of the Supreme Court of the United States.

The Circuit Court of Appeals of the Fourth Circuit laid down the same rule in the case of Counts v. Columbus Buggy Co. et al., 210 Fed. 748, 127 C. C. A. 298, in which Circuit Judge Pritchard said:

"The matter must be determined solely as respects the time of the commission of the alleged act of bankruptcy."

The Circuit Court of Appeals of the Fifth Circuit seem to have had the same idea in mind in its decision in the case of Olive v. Armour & Co., 167 Fed. 517, 93 C. C. A. 153, 21 L. R. A. (N. S.) 109. See also In re Folkstad (D. C. Montana) 199 Fed. 363, 29 Am. Bankr. Rep. 77; Virginia Chemical Co. v. Shelhorse, et al. (C. C. A. 4th Cir.) 228 Fed. 493, 143 C. C. A. 75, 35 Am. Bankr. Rep. 720.

Indeed, counsel for the petitioning creditors in the very able brief which they filed in this case seem to concede that the status of the defendant was to be determined as of the time of the alleged acts of bankruptcy. This may, therefore, be regarded as the general rule on the subject, and we see nothing in the evidence to take the case out of this general rule.

[2] 2. The next question, therefore, in this case, is whether or not the defendant at the time of the commission of the acts of bankruptcy,

·to wit, on September 28 and October 4, 1915, was a wage-earner or was ·chiefly engaged in farming or the tillage of the soil, within the meaning of section 4b of the Bankruptcy Act. On a review of the entire evidence in the case, and considering all the pursuits and activities of the defendant, the special master came to the conclusion that the defendant was chiefly engaged in farming, and therefore not subject to adjudication. It has not been made to appear to the court that this finding was erroneous.

From the facts stated in the first part of this opinion it appears that while the defendant was connected with the City Loan & Insurance ·Company, the Farmers' Warehouse & Gin Company, and the Irwin County Produce Company, he devoted very little time to these business ventures, and derived no income from same. These ventures seem to have been entirely "side lines" with him. They were managed entirely by other persons, and the defendant took no part in the management of same. During the first part of the year 1915, and up to September 7th, he was employed by the bank as its cashier at a salary of $115 per month, which was at the rate of $1,380 per year, and in this capacity was a wage-earner, as defined by section 1 (27) of the Bankruptcy Act, which defines a wage-earner to be:

"An individual who works for wages, salary, or hire, at a rate of compensation not exceeding one thousand five hundred dollars per year." (Comp. ·St. 1913, § 9585.)

As such wage-earner, under the provisions of said Bankruptcy Act, he would not be subject to adjudication. However, while he was thus engaged as cashier, he was at the same time engaged in the farming operations above described, which must be conceded to be on a somewhat large scale, and he continued to be engaged in these farming operations after he left the bank and up to the time he absconded, on November 5, 1915. It is true he did not live on his farm, but boarded in town. Yet he kept in constant touch with his farm, and it was under his active supervision. It is true he had an overseer employed, who looked immediately after the farming operations, yet this overseer reported to the defendant, and kept him informed of what was going on at the farm, and took his orders from Tapp. The evidence shows that Tapp went out to the farm every Sunday, and walked over and inspected the same, and would also go out on holidays, and would sometimes go out during the week, before or after banking hours. He was in constant communication with his overseer also by telephone, and he saw after buying the supplies for his farm, and paid off his laborers on orders from the overseer, and he also bought all the machinery, supplies and farming implements. These farming operations also had the element of permanency, as he had been operating this farm for four or five years. The overseer testified as to the visits of the defendant to the farm and how he supervised same; and Mr. Cross also testified that he went with the defendant to the farm about once a week, often before and after banking hours during the week, and that they went together nearly every Sunday morning, and that Tapp would then walk over the farm and inspect it and instruct the overseer; that some weeks he went two or three times during the week, and at other

times once; that he went either early in the morning or late in the afternoon, out of banking hours, and that the overseer was not on the farm every time Mr. Tapp visited same. Mr. Austin, the mayor of Ocilla, also testified that he went to the farm a great many times during the week with Mr. Tapp after the bank closed, and heard him give directions as to the farming operations; that he went once a week during the week in the summer and fall, and that in October, after he left the bank, the defendant was having a large barn, 50 by 100 feet, built on the farm, for the purpose of storing hay and other farm produce. J. A. Wyche, who ran a garage in Ocilla, testified that he went with the defendant to his farm nearly every Sunday for the past two years, and that the last time he went Mr. Tapp was giving instructions to his overseer for sowing oats for the year 1916, which was after he left the bank, and just before he absconded. It appears that after he left the bank and until he absconded he was giving continual attention and oversight to his farming operations, gathering, storing. and selling his cotton, hay, corn, and other produce, and that all his farming implements and live stock, in the way of horses, mules, hogs, cattle, etc., were still on the place when he left, as well as a lot of hay and a lot of cotton and potatoes in the field. The defendant's farming operations, considering the number of acres cultivated, the number of hands hired, the number of mules and horses used, the number of live stock on the place, and the amount and value of the crops, etc., were upon quite a large and extensive scale, and the investment of money made by him in his farming operations, agricultural implements, live stock, and other property connected therewith, as disclosed by the evidence, was very much larger than his investment in all his other ventures put together. Indeed, his other investments outside of his farm were quite insignificant in comparison. So far as shown by the evidence, the entire property sought to be administered by this court consists of the crops raised on the farm, the farming implements, the horses and mules used on the farm, and the cattle and hogs on same, and the alleged acts of bankruptcy were with reference to transfers of this property.

In view of all this evidence, the court is of the opinion that the special master did not err in finding that the defendant was chiefly engaged in farming or the tillage of the soil at the time of the commission of the acts of bankruptcy. The special master had the witnesses before him, and received his impressions as to their credibility from their manner of testifying, etc., and his finding is therefore entitled to great weight with the court. In the Flickinger Case cited above, 145 Fed. 162, 76 C. C. A. 132, 16 Am. Bankr. Rep. 678, the facts were somewhat similar, as the defendant did not live on his farm, but only visited same once or twice a week, and also occasionally telephoned his directions to the manager, being engaged at the same time in the business of manufacturing wheels, and after he ceased his manufacturing business he continued to look after his farm in the same way, and the Circuit Court of Appeals there held that he was "chiefly engaged in farming," within the meaning of the statute.

[3] No single factor or element is determinative of the question, and yet each must be given due weight in arriving at a conclusion. The

amount of money invested in the enterprise, the time given to same, the amount realized therefrom, the permanency of the business, the reliance placed upon the business as a means of livelihood, etc., are all elements entering into a decision of the case, but no one of them is decisive of the question. Each case must be decided upon its particular facts. Where the defendant is engaged in several occupations at the same time, as stated by the Circuit Court of Appeals of the Ninth Circuit in the case of American Agricultural Chemical Co. v. Brinkley, 194 Fed. 411, 114 C. C. A. 373, 27 Am. Bankr. Rep. 438:

"All the debtor's activities and pursuits must be considered as a whole in passing upon the question."

In this case, therefore, keeping all the circumstances surrounding the debtor in mind, and considering all his activities and pursuits as a whole, the court is of the opinion, from the evidence appearing in the record, which it has carefully read, both in the question and answer form and in the narrative form prepared by the special master, that the defendant was chiefly engaged in farming or the tillage of the soil, within the meaning of the Bankruptcy Act, and therefore not subject to adjudication. Gregg v. Mitchell, 166 Fed. 725, 92 C. C. A. 415, 20 L. R. A. (N. S.) 148, 16 Ann. Cas. 510; Sutherland Medicine Co. v. Rich, 22 Am. Bankr. Rep. 85; In re Terry (D. C.) 208 Fed. 162; In re Dwyer (C. C. A. 7th Cir.) 184 Fed. 880, 107 C. C. A. 204; Wulbern v. Drake (C. C. A. 4th Cir.) 120 Fed. 493, 56 C. C. A. 643; Couts v. Townsend (D. C.) 126 Fed. 249.

3. Even if the defendant should not be considered as being chiefly engaged in farming, it appears from the evidence that up to September 7th he was a wage-earner, being employed until that date in the First National Bank of Ocilla at a salary of less than $1,500, and that after September 7th he worked with the Irwin County Produce Company, according to the testimony of its manager, Mr. York, during the period when he is alleged to have committed the acts of bankruptcy declared upon in this case and up to the time he absconded, as an employé of the Irwin County Produce Company at a salary of $40 per month, and assisted in collecting the guano notes due that company, while at the same time he was winding up his farming operations for the year. This would also make him a wage-earner from the time he left the bank until the time he left the country, if his farming operations are to be ignored, his other lines of business being entirely negligible, as above stated.

a. It would seem, also, that petitioning creditors and interveners should be bound by the allegations of their petition. In their petition they allege that:

"For the greater part of six months next preceding the date of the filing of the petition the said Tapp was cashier of the First National Bank of Ocilla, and during said period his principal occupation was being cashier of said bank, but during said period the said Tapp was also engaged in the business of running a gristmill and the mercantile business under the name of the Irwin County Produce Company. * * * He was also engaged in the fire insurance business during the greater portion of said period. The salary of said Tapp as aforesaid was more than $1,500 a year, and he was not and is not a wage-earner or chiefly engaged in farming."

It appears from this quotation from the petition that petitioners depended for their case upon establishing the allegation that for the greater portion of six months prior to the filing of the petition the defendant's occupation was being cashier of a bank at a salary of more than $1,500 per year, and therefore they expected to secure his adjudication by proving this fact. It developed on the trial, however, that at no time during the year 1915 did the defendant receive a salary of more than $115 per month, which was at a rate of less than $1,500 per year. They therefore failed to prove their case as laid. However, it is the view of the court that in no event, under the pleadings and the evidence, is the defendant subject to adjudication as a bankrupt, and an order may therefore be taken dismissing the petition, with costs against the petitioning creditors and interveners.