**In re POWELL et al.**
No. 1528.

United States District Court
D. Delaware.

May 12, 1954.

Robert W. Tunnell, of Tunnell & Tunnell, Georgetown, Del., for bankrupt.

William Prickett, Wilmington, Del., and John E. Mulder, of Wexler, Mulder & Weisman, Philadelphia, Pa., for petitioning creditor.

LEAHY, Chief Judge.

On January 27, 1953, Harper Feed Mills, Inc., petitioned to have Edwin R. Powell and Joshua E. Turner and the partnership known as Powell & Turner, composed of the same individuals, adjudicated bankrupts. By answer the alleged bankrupts denied they were subject to an involuntary proceeding in bankruptcy because as individuals and as a partnership they were farmers engaged primarily in the raising of poultry in an unmanufactured state. The Referee, after hearing testimony, receiving evidence and considering counsel's arguments, adjudged the individuals and the partnership bankrupts. The alleged bankrupts petition to review and set aside the Referee's order of adjudication.

The record shows from 1937 until 1945, Powell & Turner, as individuals and partners, processed poultry in Sussex County, Delaware. From 1945 until July or August 1952, they engaged in raising broilers. In the operation of their business, they supplied all feed, medicine, and incidentals, bought the young chicks and placed them with various farmers for feeding and care in rented chicken houses. The partnership rented the farmers' houses for raising the broilers under leases whose tenure was for the time necessary to raise a flock, usually about twelve weeks. Storage bins for feed were rented on a monthly basis. The all-important item of feed was ordered, billed, and shipped to the partnership, picked up by their trucks and either delivered on call to the various farmer-lessors or stored in the rented bins. Until mid-1952, the partners' pattern of operation was to buy the baby chicks regularly and put them out for feeding and care until maturity, rather than to follow uniformly the twelve-week cycle of flocks. Thus, the partners generally had some broilers ready for market all the time. The capacity of their production at any one time was about 800,000 chickens. They owned in their own right a forty-five acre farm which had a chicken capacity of 72,000 and the necessary equipment, but the Referee found as a fact only a relatively few were raised on this farm by the partners themselves.

Each of the partners had assets including real estate held jointly with their wives; together they owned other realty at Bethany Beach, Delaware, from which they realized rents; they also owned five trucks, a tractor, a coal loader, some stoves, water troughs and feeders. Feed was bought on credit from several companies, and as of July 1952, the partners owed more than $250,000 to their feed suppliers. The partnership financial statement issued on September 12, 1950, showed a net worth of $175,475.74. The March 25, 1952, statement reflected a net worth of $213,426.46. Realty—including property jointly owned by the partners and their wives but not identified as such in the assets—was included in both statements, in the first at a valuation of $172,000 and in the second at $192,000. On May 17, 1952, a third partnership statement omitted about $140,000 of realty from the assets, representing the jointly-owned realty and showed a negative net worth of minus $139,528.15. After May 1952, the feed creditors and others refused the partners' requests for further credit purchases and extensions of feed debts past due. From June to mid-August 1952, the partners raised only the

broilers on hand and marketed them as they matured, but put in no new flocks because of inability to obtain feed on credit. The last leases on chicken houses expired without renewal in mid-August, 1952. The storage bin leases were cancelled in July 1952, and the partners testified they then began to prepare for storage and office space on one of their own farms. Admittedly, no chickens were raised by the partnership or by the individuals after mid-August 1952 in either the rented houses or on the partnership farms. In July and September 1952, inconclusive meetings were attended by the partners and principal feed creditors, but no new credit came of them. During the period May-July 1952, cash or judgment notes aggregating more than $50,000 were paid or given by the partners to local creditors. On December 4, 1952, the partners committed the specified act of bankruptcy: while insolvent, they permitted Richards Milling Company, a feed creditor, to obtain a lien on their real estate by entry of a $125,444.93 judgment, which was not vacated or discharged within the following thirty days.

Petitioners claim they as individuals and as a partnership are farmers [1] and are immune to an involuntary adjudication under the exception of § 4, sub. b of the Bankruptcy Act, 11 U.S.C.A. § 22, sub. b.[2] The Referee found as a key fact they were not farmers on December 4, 1952, the date of the act of bankruptcy, since admittedly they raised no poultry from mid-August through December 1952 and none after that. Citing Judge Bradford's comment on the farmer exception proviso in In re Mackey, D.C.Del., 110 F. 355, the Referee ruled the alleged bankrupts had not proved themselves within the exception by merely showing

they had for some time in the past been farmers. Petitioning creditors have shown jurisdiction here since the bankrupts had not been engaged in farming for a reasonable time before the act of bankruptcy.

Petitioners advance five factual arguments to support their claim they were farmers on December 4, 1952:

■ **1.** *Ownership of substantially the same property after the date of the act of bankruptcy as before when operations were at their peak level.* The partnership property was not a controlling asset of the business as it was operated. The distinguishing feature of Powell & Turner's method of operations was the use of property and facilities of others on a rental or profit-sharing basis to the practical exclusion of their own property. This was the core of their business. Retention of such incidental servicing property as the trucks, troughs, and coal loader is not indicative of a farmer's status or even of an intent to be a farmer. It is as consistent with later use of these items in other non-farming employment, retention for purposes of their sale or rental to other farmers, or their use at some indefinite, future time when their former poultry business might be resumed. Use of the equipment in farming would have proved petitioners' point; non-use is a contrary indication, and bare retention of such personal property is at best equivocal.

■ **2.** *Adoption of no new occupation coupled with partners' attempts to pacify feed creditors so poultry operations could be resumed.* The negative evidence the partners have not chosen to follow a new occupation other than farming is weak. One who has once been a farmer but who ceases farming without

---

**1.** " 'Farmer' shall mean an individual personally engaged in farming * * * and shall include an individual personally engaged * * * in the production of poultry, * * * or poultry * * * products in their unmanufactured state, if the principal part of his income is derived from any one or more of such operations". § 1(17), Bankruptcy Act, 11 U.S.C.A. § 1(17).

**2.** "Any natural person, except a wage earner or farmer, and any moneyed, business, or commercial corporation, * * * owing debts to the amount of $1000 or over, may be adjudged an involuntary bankrupt * * *. The status of an alleged bankrupt as a wage earner or farmer shall be determined as of the time of the commission of the act of bankruptcy."

taking up a different work cannot accurately be termed a farmer by occupation. The most to be said is, his last occupation was farming or he formerly was a farmer. In any event, weighting this factor with such favorable significance as it might possibly have for the partners, it falls short of conviction. Further, it receives no support from the debtor-creditor meetings. The partners' offer to resume operations was only on terms most favorable to them and without risk to them. They proposed the feed creditors would pay all business expenses, including increased salaries to the partners, profits would be shared by creditors and debtors, and partners would supervise operations as previously conducted. The proposition was summarily rejected by the creditors. All this is not evidence of such a bona fide attempt to settle with creditors that the cessation of business must be deemed an involuntary interruption and not an abandonment. Terms of an offer in such a situation may be so prohibitive and unacceptable the attempt to settle is one in name only.

3. *Referee's alleged improper consideration of and emphasis on the partners' deletion from their May financial statement of assets owned jointly with their wives.* Petitioners argue this realty owned by the entireties should never have been listed among partnership assets, and its withdrawal from the statement was neither improper nor voluntary. However, I concur with the Referee's conclusion the partners had represented to their feed suppliers and others at least from September, 1950, the realty was subject to partnership liabilities. On the strength of these financial statements credit for feed was extended. Had the realty not been included, there is doubt the feed suppliers would have allowed the credit purchases to mount to some $250,-000. That the realty appeared in the statements by happenstance is not likely. It was the largest single item in the September 1950 statement and the second

highest asset valuation in the March 1952 statement. Attention must have been given the realty because its valuation in the 1950 statement was increased $20,000 in the March 1952 one. Obtaining feed on credit, as the Referee concluded, was the basic tenet of the partners' business beliefs, without which they did not choose to operate. Having so long represented to creditors the realty was partnership property, the partners must have known its sudden withdrawal from their asset list—less than two months after the previous statement had been issued increasing its valuation—would automatically kill their credit and with it their poultry business. In this sense, the Referee decided the partners had acted voluntarily and inconsistently with their present assertion of an intent to continue as farmers. I agree. Under these circumstances, I am not dissuaded by the co-ownership of the realty by the partners' wives. The record discloses all the realty, including all jointly held, had for several years been mortgaged to the Millsboro Trust Company to secure a $35,000 business loan to the partnership, the wives necessarily joining in this obligation.[3] Judgment notes to secure other loans for the business interests were signed by both the partners and their wives.[4] Weekly checks were paid to the wives by the partnership although no services were rendered.[5] An informal loan of $6,000 to the partnership was repaid to a partner's wife.[6] Having been so closely aligned with business matters, the partners' wives may well be chargeable with actual or constructive knowledge and consent the realty they partially owned was held out as a partnership asset and as security for partnership debts.

4. *Absence of evidence of partners' intent to discontinue poultry farming.* The Referee emphasized his reliance on objective facts in determining the status of the partners and was not persuaded by their avowals of continuing as farmers. Ample record evidence supports his con-

3. Referee's Record, 175–176, 260–262, 264.
4. Id., 271, 274.
5. Id., 243–244.
6. Id., 235–238.

·clusion. Many signs there were wholly consistent with the bankrupts' awareness of creditor action and preparing themselves against the time when the financial storm would deluge the business. The partners realized the business was not producing profits.[7] Their wives were insistent they protect the homes and joint property.[8] Without demand or threat of foreclosure, the partners paid the full $35,000 mortgage on this property in May, 1952.[9] The jointly owned realty having been cleared of business liens of record, it was withdrawn from the partnership statement of assets. In the period from July 25, 1952, until September 6, 1952, the partners withdrew $14,600 for personal use.[10] In 1951 and early 1952, the partners paid for six new automobiles for themselves and members of their families from business funds.[11] A longstanding business account of $4,676.-00 with a partner's brother was suddenly paid in full on September 6, 1952.[12] In June and July, 1952, local creditors were either paid in cash or given judgment notes by the partners in a total amount of about $50,000.[13] The concurrence of these acts in seeming liquidation, coupled with sale of the closing feed inventory,[14] lapse of the leases and no poultry production provided the Referee with sufficient ground in which to root his conclusions. As offsetting evidence, petitioners point only to partners' testimony of intent to continue as farmers, negotiations for the feed creditors to assume the risks of the operations when resumed, and painting an office for later occupancy. This presentation is not persuasive.

5. *Creation of partners' farming inactivity by creditors themselves.* Petitioners would have the feed creditors charged with stopping the poultry business because they refused to extend further credit. This is not realistic. The partners conducted their own business.

The creditors are in no way responsible for its present misfortunes. Every practical reason revolts against denying the creditor Harper, for example, redress for the large backlog of debt because of a refusal to let the bankrupts increase that very debt. Further, the Referee found the creditor did not expressly request discontinuance of the poultry business and the partners had at their disposal all the means necessary to continue raising some poultry if they so desired. They had their own farms and equipment, and about a $23,000 bank balance as late as January 3, 1953.[15] Had they been more economical and not disturbed the jointly-owned realty as security for business loans, they could have continued in business, even though on a smaller scale. Having decided to cease operations, the partners lost any immunity they might have had, either individually or as a partnership, to an involuntary adjudication. The duration of their farming inactivity was also sufficient. Based on their mode of operations, the cessation was analogous to that of a farmer of annual crops who had put in no new crop for nearly three years.

The sum effect of the record facts supports the Referee's conclusion the cessation of poultry raising from mid-August to the date of the act of bankruptcy in December was voluntary in its inception and was not a temporary halt. It was rather an indefinite stoppage of farming sufficient to make the individuals and the partnership susceptible to an involuntary adjudication in bankruptcy. Thus, since there is ample evidence to sustain the Referee's findings and conclusions, the petition for review should be dismissed and the Referee's order of adjudication affirmed. Lodi Trust Co. v. Cohn, 3 Cir., 1939, 108 F.2d 26.

An order may be submitted.

---

7. Id., 200, 265.

8. Id., 200, 265–266.

9. Id., 175–176, 260–262, 264.

10. Id., 233, 235, 238, 294, 296, 299, 304.

11. Id., 288–294.

12. Id., 296–299, 212.

13. Id., 62, 284, 270, 276.

14. Id., 287–288.