In the Matter of Joseph F. WHITE, Sr., Bankrupt.

No. 38349.

United States District Court
D. Colorado.

Feb. 18, 1965.

William R. Young, Englewood, Colo., for bankrupt.

John R. Hickisch, Denver, Colo., for General Ins. Co. of America.

DOYLE, District Judge.

Petitioner, Joseph F. White, Sr., seeks review of an order of the Referee in Bankruptcy dated October 23, 1964, in an involuntary proceeding initiated by bankruptcy petitioner General Insurance Company of America. While three errors are alleged, it appeared at a hearing held on January 25, 1965, that Joseph White relies primarily on the contention that he was a "farmer" at the times of the alleged acts of bankruptcy.

Section 4, sub. b of the Bankruptcy Act, Title 11 U.S.C. § 22, sub. b provides:

"Any natural person, except a wage earner or farmer * * * may be adjudged an involuntary bankrupt * * * The status of an alleged bankrupt as a wage earner or farmer shall be determined as of the time of the commission of the act of bankruptcy."

The definition of a "farmer" is set forth in Title 11 U.S.C. § 1(17):

" 'Farmer' shall mean an individual personally engaged in farming or tillage of the soil, and shall include an individual personally engaged in dairy farming or in the production of poultry, livestock, or poultry or livestock products in their unmanufactured state, if the principal part of his income is derived from any one or more of such operations; "

Petitioning creditor concedes that it has the burden of proving that Joseph White is not a farmer within the meaning of the above sections. Hinrichs v. John Deere Co. of Moline, 7 Cir., 314 F.2d 384 (1963).

The involuntary bankruptcy petition filed May 1, 1964, alleged two acts of bankruptcy: the execution by Joseph White on February 14, 1964 of a deed of trust as security for an antecedent debt; and failure to vacate a judgment lien obtained by petitioning creditor on February 17, 1964. By a subsequent amendment, a third act of bankruptcy was alleged in that Joseph White conveyed nonexempt real property to his son, William W. White, and his daughter-in-law, Rita J. White.

The only oral testimony produced at the hearing before the referee was that of Joseph White. This evidence, together with documentary evidence, tended to establish that Joseph White had been President of the J. F. White Engineering Company since 1947, when the corporation was organized, to about 1962 when it became defunct. This firm was engaged in heavy construction contracts, such as power plants and dams. Joseph White never formally resigned from his position as President. He did, however, simply cease his activity in that capacity.

In 1958, the corporation acquired the Jackson Creek ranch in Douglas County, Colorado, and this ranch was transferred to Joseph White and his wife, Orcelia White, on December 31, 1959. The property was sold on or about August 30, 1963, and another ranch which is located in Nevada was purchased with the proceeds. This occurred between November 22, 1963 and January 9, 1964. Essentially, each ranch was used to breed heifers bought in early spring to purebred bulls. The pregnant heifers would then be sold as replacement cattle in the fall, although if the market warranted or necessitated it, they would be retained until they calved the following spring. The 1963 joint income tax return filed by Joseph White and his wife indicates that the gross income obtained from the sale of that year's herd was $70,000.00. In addition, crops consisting primarily of alfalfa were planted and harvested on about 6,000 acres of the 17,000-acre Nevada ranch. In short, there can be little doubt that the operation of the ranch did involve the production of livestock within the meaning of 11 U.S.C. § 1(17). The question is, therefore, whether there is sufficient evidence to support the referee's finding that Joseph White was not a farmer.

The evidence establishes that Joseph White's son, William White, was foreman of the ranches in Colorado and in Nevada since 1958. At that time, Joseph White was concerned with the management of his company which in 1960 and 1961 was involved in the performance of contracts exceeding one million dollars. Until that time, therefore, his son, and possibly to some extent his wife, ran the ranch. The cattle on the ranch was purchased with money secured by a note negotiated by his son, William. In short, Joseph White's participation in the operation of the ranch may have been found to be negligible by the referee. The evidence is sufficient to support the proposition that Joseph White's connection with the ranch was insubstantial—was merely formal. Even the extent of this interest is not clear since his son and his daughter-in-law signed the note on the $200,-000.00 mortgage given to Connecticut Mutual Insurance Company to purchase the Nevada ranch, and on June 19, 1964 Joseph White transferred his interest in the ranch to his son and his daughter-in-law and received no consideration in return. Furthermore, while failure of the farming enterprise does not negate the status of farmer, failure over a period of years to receive any income from farming may indicate that the putative farmer is not really relying on farming as his primary source of income. In this case, Joseph White concedes that he received no net income from his alleged farming activities through 1964. In this vein, we note that Joseph White testified, on page 70 of the transcript of the hearing before the referee, that he was attempting to reestablish his business. In other words, it appears that although the company became defunct in 1962, Joseph

White's efforts were directed to the re-establishment of that or another business, but not farming.

The evidence tending to support Joseph White's position that he was a farmer is insubstantial. The titles of the Colorado and Nevada ranches were partially in his name; he declared a homestead on the Nevada ranch; he participated in a feed grain program and received payment from the Department of Agriculture for replacing barley crops with alfalfa; his joint federal income tax return for 1963 was a Schedule F; a cattle brand was issued in his name both in Nevada and in Colorado. On the other hand, an advertisement in the Western Livestock Journal was in his son's name—Joseph White explained that this is normal procedure. The referee appears to have disbelieved White's testimony that he located the heifers to be bought in Kansas and in Oklahoma, that he controlled policy decisions, such as when to sell the livestock or how many to buy, and which crops to plant.

On these facts, the referee could well have found that Joseph White was not personally engaged in the production of livestock in analogy to those cases holding that one who owns a farm and rents it to a tenant is not a farmer. See 1 Collier on Bankruptcy ¶14.15, page 619, and cases cited in footnote 32. In the case at bar, Joseph White conceded that the nature of the operation of the ranch was a partnership between himself, his wife, and his son. It is not reasonable to hold that an inactive partner stands in a better position than a landlord.

■ Another theory supporting the referee's finding is in analogy to the well-established rule that the farming activities must be substantial. Traditionally, the scale of the farming operation has been judged by quantitative standards. Swift v. Mobley, 5 Cir., 28 F.2d 610 (1928); First National Bank & Trust Co. v. Beach, 301 U.S. 435, 57 S.Ct. 801, 81 L.Ed. 1206 (1936). The same result should obtain where, as here, the personal participation of one of several partners is negligible, even though the operation with which he is associated is extensive.

■ Finally, we note that the referee did not articulate the reasons in support of his finding that the petitioner was not a farmer. As shown above, there are many reasons in support of a finding that the petitioner was an artificial farmer—that his farming activities were in substantial degree a cover-up to prevent the assets here in dispute from being subjected to creditors' demands. We must presume that the referee considered fully the entire record and was fully aware of its various aspects. In view of this we are not at liberty to disturb the referee's finding of fact on the basis that it failed to specify the referee's thinking.

■■ We note that petitioning creditor erroneously maintained that the status of the bankrupt as a farmer at the time the debts were incurred rather than at the time of the alleged acts of bankruptcy controls. In re Powell, D.C., 121 F.Supp. 33 (1954); In re Harriman, D. C., 31 F.Supp. 50 (1939). In the case of a voluntary petition in bankruptcy, filed pursuant to Title 11 U.S.C. § 203 it is the time that the debts were incurred which controls. The court in Smith v. White, 9 Cir., 166 F.2d 269, 3 A.L.R.2d 538 (1948), attempted to distinguish a voluntary petition in bankruptcy from an involuntary petition. See page 272, footnote 4. Nevertheless, to say that the status of farmer is to be determined at the time of the alleged acts of bankruptcy rather than at the time the debts were incurred is not to say that the source of indebtedness has no probative value in determining the issue, especially where both farming and non-farm operations are conducted simultaneously.

■ The second alleged error in Joseph White's petition for review is that the evidence does not support the referee's finding that he was insolvent at the time of the acts of bankruptcy. This finding is not to be set aside unless

clearly erroneous. See 1 Collier on Bankruptcy, ¶1.19[5], page 129, and cases cited in footnote 29. The evidence established that White was indebted in the amount of two judgments entered January 23, 1964, aggregating about $140,-000.00. The evidence also establishes that virtually the only asset was White's one-half interest in the Nevada ranch which was bought early in January, 1964, for $328,000.00, including a $200,000.00 mortgage. On a cost basis, therefore, White's interest was about $64,000.00. White testified that, although he had bought the ranch for $328,000.00, its fair value was really $550,000.00. This was the sole testimony on the question. In order to render White solvent, the value of the ranch would have had to exceed $480,000.00, or almost forty-six per cent. (46%) more than the cost of the ranch a few months earlier. While the cost of the ranch is certainly not dispositive of its fair value some months later, we cannot say that the referee's finding that the fair value did not so exceed the acquisition cost as to render White solvent is clearly erroneous even though there was an owner's appraisal which was not disputed—Such an opinion is not, of course, binding.

Finally, the petition for review alleges as error a finding that Joseph White committed an act of bankruptcy on June 19, 1964, subsequent to the filing of the creditor's petition. This contention appears to have merit. See 1 Collier on Bankruptcy, ¶3.701, page 522. If Joseph White is adjudicated a bankrupt as of May 1, 1964, a transfer by him on June 19 is null and void. He cannot commit an act of bankruptcy after he is a bankrupt. It is, therefore,

Ordered that petitioner Joseph F. White, Sr.'s prayer that he be declared a farmer within the meaning of Title 11 U.S.C. § 22 be, and the same is hereby denied; it is

Further ordered that said petitioner's prayer that the referee's finding that he is a bankrupt be reversed be, and the same is hereby denied; it is

Further ordered that said petitioner's prayer that the referee's finding that an act of bankruptcy was committed on June 19, 1964 be reversed be, and the same is hereby, granted.